# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:23-MJ-03829 LOUIS

**UNITED STATES OF AMERICA,**

v.

**JUAN ANDRES DONATO BAUTISTA,**

Defendant.

_____/

FILED BY _NJA_ D.C.

DEC 11 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

### HERRING NETWORKS, INC.'S MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF UNSEALING THE COURT'S DOCKET AND RELATED RECORDS AND SUPPORTING MEMORANDUM OF LAW

Herring Networks, Inc. d/b/a One America News Network ("OAN") moves to intervene in this matter for the limited purpose of unsealing and obtaining access to the docket and all documents filed under seal with this Court in the above-captioned case. The existence and substance of the once-public charging documents in this matter – which accuse the Defendant of bribery and money laundering in connection with elections in the Philippines involving unnamed voting technology companies (purportedly multiple Smartmatic entities, collectively referred to as "Smartmatic") – have been widely reported around the world. Indeed, both the Defendant and Smartmatic have publicly addressed and acknowledged the charges, which only very recently resulted in Smartmatic's disqualification from participation in elections in the Philippines. Given the ongoing public interest and concern with election integrity in this country and elsewhere, public access and scrutiny of these proceedings is critically important and mandated under the First Amendment and applicable common law. Thus, OAN requests that this Court grant its motion to intervene, immediately unseal the docket, and otherwise make all records filed in this case available for public review.

## RELEVANT FACTUAL BACKGROUND

On September 20, 2023, the United States Department of Homeland Security's Homeland Security Investigations unit ("Homeland Security") filed a criminal cover sheet, complaint and supporting probable cause affidavit (collectively the "Complaint") against Defendant Juan Andres "Andy" Donato Bautista ("Defendant" or "Bautista") – the former Chairman of the Commission on Elections of the Republic of the Philippines ("COMELEC") – in the above-captioned matter. When filed, these documents were publicly available *and* accessed. Almost immediately, however, for reasons currently unknown, the docket and all filings were sealed and thereafter blocked entirely from public view.

The "Criminal Complaint by Telephone or Other Reliable Means" dated September 19, 2023, and filed the next day (on September 20) accuses the Defendant of various charges under 19 U.S.C. § 1956, including conspiracy to launder monetary instruments, promotional money laundering and concealment money laundering. *See* ECF No. 1, at 2 (attached as **Composite Exhibit A** to this motion).

Based on its investigation, Homeland Security asserts that Bautista "received and attempted to receive bribes . . . in exchange for using his position as Chairman of COMELEC to assist" several unnamed entities to obtain "lucrative election voting machine and related services contracts with COMELEC for the 2016 Philippine elections." *Id.* at p. 12 ¶¶ 36-37. The investigation also focused on Bautista's alleged "acts to launder his bribe proceeds related to the scheme." *Id.* at ¶ 36.

According to the Complaint, Bautista's co-conspirators include "an election voting machine and service provider company," its parent, subsidiaries, joint venturers, and several of their agents, who allegedly used "slush funds" and "fake contracts" to facilitate the alleged bribes,

while covering their actions using personal email accounts and messaging applications. *See id.* at ¶¶ 18-21, 23-26, 44, 48, 51, 53. "In or around the later part of 2015 and into 2016," one of these companies "won bids for three contracts worth a total approximate value of one hundred ninety-nine million dollars ($199,000,000) to supply COMELEC with voting machines and related services for the [Philippines'] May 2016 elections for President, Vice-President, and other official positions." *Id.* at ¶ 22.

Although the Complaint does not name the entities involved in the alleged scheme, numerous reports confirm the involvement of Smartmatic (comprising Smartmatic USA Corp., Smartmatic International Holdings B.V., and/or SGO Corporation Limited), given that Bautista is reported to have "awarded $199 million in contracts to Smartmatic for about 94,000 voting machines and to handle the results of the Philippines' presidential election in 2016." *See* Marshall Cohen, *Smartmatic Implicated In Alleged Bribery Scheme Involving Top Filipino Election Official*, CNN (Sept. 22, 2023), https://www.cnn.com/2023/09/22/business/smartmatic-bribery-scheme-indictment/index.html ("CNN Article"); *see also* ANC 24/7, *COMELEC Asks U.S. Gov't For More Information On Bautista's Case*, YouTube (Oct. 4, 2023), https://www.youtube.com/watch?v=Iv-Abl_ds0Q&ab_channel=ANC24%2F7.

Indeed, due in part to the filing of the Complaint, COMELEC has disqualified Smartmatic from all procurements. *See In the Matter of the Petition to Review the Qualifications of Smartmatic Philippines, Inc. as a Prospective Bidder*, E.M. No. 23-003, at 13-14 (COMELEC Nov. 29, 2023) (Phil.) (the "COMELEC Resolution," attached as **Exhibit B** to this motion); *see also* Hana Bordey, *Smartmatic Disqualified From Comelec Procurements – Garcia*, GMA News Online (Nov. 29, 2023), https://www.gmanetwork.com/news/topstories/nation/889875/smartmatic-disqualified-from-comelec-procurements-garcia/story/ ("Smartmatic, the service provider[,] was disqualified

due to the bribery allegations against former Comelec chairperson Juan Andres 'Andy' Bautista 'in exchange for awarding a contract for election machines to Smartmatic Corp.'"); CNN Philippines, *Smartmatic Disqualified From Comelec Procurements*, YouTube (Nov. 29, 2023), https://www.youtube.com/watch?v=gL6OzwaVOp8&ab_channel=CNNPhilippines.

Shortly after the Complaint was filed, Defendant Bautista himself took to the social media platform "X" (formerly known as Twitter) on September 21, 2023, to express how "surprised" he was "to learn about a complaint filed against [him]" related to allegations concerning "bribe money *from Smartmatic* or any other entity." *See* Bautista's Tweets, true and correct copies of which are attached as **Exhibit C** (the "Tweets") (emphasis added). [1]

Smartmatic also acknowledged its involvement in the case through spokesperson Samira Saba, who reportedly denied that Smartmatic had ever won "a project through any illegal means" and asserted that the charges against Bautista are "not related to Smartmatic election security or integrity." *See* CNN Article; *see also* Victoria Tulad, *Smartmatic Calls Disqualification Against Them In Future Elections 'Unfair'*, ABS-CBN News (Nov. 30, 2023), https://news.abs-cbn.com/news/11/30/23/smartmatic-calls-disqualification-against-them-unfair (An official statement issued by Smartmatic acknowledges the accusations against it regarding the COMELEC contracts, claiming the allegations to be "absolutely false"); Press Release, Smartmatic, Statement Smartmatic (Nov. 29, 2023) (attached as **Exhibit D** to this motion) (noting the company's "profound disappointment in the decisions made by [COMELEC] to disqualify Smartmatic from bidding on the 2025 contract for election technology"). [2]

---

[1]  *Also available at* https://twitter.com/ChairAndyBau/status/1704999025500385560?s=20.

[2]  Smartmatic has also been entangled in highly publicized controversies concerning its involvement in the U.S. 2020 elections. For example, it has filed a litany of defamation lawsuits against various media entities, including OAN, and other individuals based on allegations that they falsely reported that Smartmatic was involved in a plot to rig the presidential election against

Although the Complaint was initially available, the entire docket and court records related to this case have since been sealed. Such so-called "super sealing" deprives the public of *all* information concerning the case, including the course and status of the proceedings, whether and to what extent there have been additional filings, and the reasons justifying this extraordinary confidentiality in a criminal case. As discussed below, such wholesale secrecy is unconstitutional and impermissible.

## DISCUSSION

### I.      OAN Has Standing to Intervene.

The Eleventh Circuit has repeatedly recognized the news media's right to intervene in matters to challenge the denial of access to court proceedings and records. *See, e.g.*, *United States v. Ellis*, 90 F.3d 447, 449 (11th Cir. 1996), *cert. denied*, 519 U.S. 1118 (1997); *United States v. Valenti*, 987 F.2d 708, 711 (11th Cir. 1993) *cert. denied*, 510 U.S. 907 (1993); *Newman v. Graddick*, 696 F.2d 796, 800 (11th Cir. 1983).   Only through intervention can the public's right to open courts and records be vindicated. *Newman*, 696 F.2d at 800.

There is no question that OAN has standing to intervene for access. OAN is a news organization that focuses on national political affairs and produces original video and written news content. It also maintains a news website at www.oann.com. It uses public records, including court records, as important newsgathering sources. Accordingly, OAN should be permitted to

---

Donald Trump. *See Smartmatic USA Corp. v. Newsmax Media Inc.*, No. N21C-11-028-EMD (Del. Super. Ct.); *Smartmatic USA Corp. v. Herring Networks, Inc.*, No. 1:21-cv-02900 (CJN) (D.D.C.); *Smartmatic USA Corp. v. Fox Corp.*, No. 2022–01291 (N.Y. Sup. Ct.); *Smartmatic USA Corp. v. Lindell*, No. 22-cv-0098 (WMW/JFD) (D. Minn.); *Smartmatic USA Corp. v. Powell*, No. 1:21-cv-02995 (CJN) (D.D.C.); *Smartmatic USA Corp. v. Montgomery*, No.: 2:23-MC-5-JLB-KCD (M.D. Fla.).

intervene for the limited purpose of asserting the public's right of access to the court records and proceedings in this matter.

## II.      This Court Should Unseal the Docket.

As discussed below, the public is entitled access to criminal court dockets except in the rarest of circumstances.  Here, there is simply no justification for constraining the press and public's First Amendment rights because, among many other reasons, the facts and allegations of the criminal complaint against Defendant Bautista have been widely reported.  Accordingly, the docket should immediately be unsealed.

### A.  A Constitutional Right Of Access Attaches To Criminal Court Dockets.

The U.S. Supreme Court has consistently recognized that the public and press have a presumptive First Amendment right of access to judicial proceedings in criminal cases. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980). Though the right of access to criminal trials is not "explicitly mentioned in terms in the First Amendment," the Supreme Court has "long eschewed any 'narrow, literal conception' of the Amendment's terms." *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 604 (1982).  This right has been extended both to criminal trial proceedings and certain court records.  *See*, *e.g.*, *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 10, 13 (1986) ("Press-Enterprise II") (right of access to preliminary hearings); *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 505 (1984) (right of access to voir dire); *Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983) (right of access to court records and transcripts).  Further, this constitutional right attaches to records that have been historically available to the public and whose disclosure advances the functioning of the judicial system.  *Press-Enterprise II*, 478 U.S. at 8-9.  As the Supreme Court has explained:

6

> [T]he historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open. This is no quirk of history; rather, it has long been recognized as an ***indispensible attribute*** of an Anglo-American trial.

*Richmond Newspapers*, 448 U.S. at 569 (emphasis added).

This collective commitment to transparency is rooted in the recognition that "the means used to achieve justice must have the support derived from public acceptance of both the process and its results." *Id.* at 571. In other words, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* at 572. In contrast, "[w]hen a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case[.]" *Id.* This historic expectation, and right, of public access to criminal trials is not merely a matter of tradition; it is also "implicit in the guarantees of the First Amendment," *id.* at 580, because without the freedom to attend criminal trials, "which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated." *Id.*

Within this context, the Eleventh Circuit has ruled – in no uncertain terms – that secret dockets are unconstitutional under the First Amendment. *See Valenti*, 987 F.2d at 715 ("[T]he Middle District's maintenance of a dual-docketing system is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings."). In a subsequent case, the court acknowledged that docket sheets are of inherent public interest and "are essential to provide 'meaningful access' to criminal proceedings." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1029 (11th Cir. 2005) *cert. denied*, 549 U.S. 592 (2006) (quoting *Valenti*, 987 F.2d at 715). Specifically, the court explained:

> The docket sheet forms an integral part of a criminal proceeding, acting as both an index and a publication. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93-94 (2d Cir. 2004). As an index, the docket catalogues all the proceedings and

7

> information taken before a court in that case. It permits both the court and observers
> to locate documents and proceedings that otherwise would be lost within the court's
> vast record collections. *See, e.g., Brown v. Lester*, 21 Miss. 392, 394 (1850). It also
> allows one to quickly determine the status of a case, the actions of the parties, and
> the determinations of the judge, without requiring the inspection of every item in
> the case file. *Id.* As a publication, the docket sheet provides the public and press
> with notice of case developments. *Hartford Courant Co.*, 380 F.3d at 93-94. ***This
> role assumes particular importance when the court is considering sealing a
> proceeding or judicial record. Id.***; *Commonwealth v. Doe*, 420 Mass. 142, 648
> N.E.2d 1255, 1260 (Mass. 1995).

*Id.* at n.15 (emphasis added). As the Second Circuit has also recognized, "the ability of the public

and press to attend civil and criminal cases would be merely theoretical if the information provided

by docket sheets were inaccessible. In this respect, docket sheets provide a kind of index to judicial

proceedings and documents, and endow the public and press with the capacity to exercise their

rights guaranteed by the First Amendment.'" *Hartford Courant Co.*, 380 F.3d at 93.

## B. The Government Cannot Meet Its Burden to Seal the Docket.

A party seeking closure – presumably the government here – has a nearly insurmountable

burden to overcome the presumption of access to a criminal court docket. For the docket to remain

under seal, this Court must determine, in clearly-articulated findings, that there is a specific,

compelling interest justifying an ongoing seal that is no broader than necessary to serve that

interest. *See Ochoa-Vasquez,* 428 F.3d at 1030 ("When sealing proceedings or documents, a court

must articulate the overriding interest 'along with findings specific enough that a reviewing court

can determine whether the closure order was properly entered.'"); *see also Chicago Tribune Co.*

*v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) ("Where the trial court

conceals the record of an entire case, making no distinction between those documents that are

sensitive or privileged and those that are not, it must be shown that 'the denial [of access] is

necessitated by a compelling governmental interest, and is narrowly tailored to that interest.'").

Given the function and nature of docket sheets "[a]s a publication . . . [that] provides the public and press with notice of case developments," it is unlikely that a party could ever meet this heightened constitutional burden to justify the blanket sealing of an entire criminal docket. Indeed, as the Fourth Circuit observed in discussing the overbreadth of orders sealing a criminal docket and court records:

> There are probably many motions and responses thereto that contain no information prejudicial to a defendant, and we cannot understand how the docket entry sheet could be prejudicial. However, under the terms of the orders entered in these cases, ***this information, harmless as it may be, has also been withheld from the public.***

*In re State-Record Co., Inc.*, 917 F.2d 124, 129 (4th Cir. 1990) (emphasis added).

Absent a public docket – which generally allows the public to monitor the actions of the parties and any issued court orders – the public is left in the dark about this criminal proceeding and how it came to be "super-sealed." OAN and the public are therefore unable to determine whether any party requested to seal the docket (or any court records), to assess any purported interest in maintaining the seal, or to analyze whether any order granting closure meets the stringent First Amendment requirements.

This is particularly true where, as in this case, the information sought to be shielded has already been made public. Here, the Complaint, along with Homeland Security's very detailed probable cause affidavit, already were made public and have been the subject of extensive reporting. Under such circumstances, there is no justification whatsoever for continuing to keep these proceedings entirely secret and hidden from public view. At a minimum, the docket should be unsealed.

**III.  This Court Should Unseal All Records Filed in This Matter.**

In addition to the constitutional right of access described above – and even where it does not apply – "the courts of this country recognize a general right to inspect and copy public records

9

and documents, including judicial records and documents." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978); *see also Chicago Tribune Co.*, 263 F.3d at 1310-11 (recognizing a common law right to access judicial records).[3] In fact, the Eleventh Circuit "has been resolute" in enforcing the "presumption of public access" to judicial records because "access to judicial proceedings is crucial to our tradition and history, as well as to continued public confidence in our system of justice." *Callahan v. United Network for Organ Sharing*, 17 F. 4th 1356, 1358-59 (11th Cir. 2021). As discussed above, this presumptive right can be overcome only if the government demonstrates an overriding interest to justify sealing and such sealing is no more restrictive than required to protect that interest. *See Nixon*, 435 U.S. at 597-98.

Both rights of access are grounded in the importance of public monitoring of judicial proceedings. "[The] right to inspect and copy judicial records...like the right to attend judicial proceedings, is important if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system." *Newman*, 696 F.2d at 803. Just as with open court proceedings, broad public access to filed court records helps ensure "that the proceedings [are being] conducted fairly," while discouraging "perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Richmond Newspapers*, 448 U.S. at 569; *see also Associated Press*, 705 F.2d at 1145 ("there is no reason to distinguish between pretrial proceedings and the documents filed in regard to them").

---

[3] As the Court recently recognized in the matter concerning Donald Trump and the Mar-a-Lago search warrant, as a "practical matter" whether one proceeds under the First Amendment right or the common law right, the analysis is "materially the same." *See* ECF No. 80, at 5, Order On Motions To Unseal, *In Re Sealed Search Warrant*, No. 22-mj-8332-BER (S.D. Fla.). Under either approach: (1) the party seeking to uphold sealing must articulate an interest in secrecy that outweighs the public's interest in access; and (2) no less restrictive alternatives to sealing are available. *See id.* The Court in that case rejected the government's argument that there was sufficient justification for the complete seal of the probable cause affidavit supporting the search warrant.

Public access further promotes the "public acceptance of both the [judicial] process and its results," an "awareness that society's responses to criminal conduct are underway," and the "prophylactic aspects of . . . community catharsis." *Richmond Newspapers*, 448 U.S. at 571; *Press-Enterprise II*, 478 U.S. at 9. For these reasons, "[a] presumption of access must be indulged to the fullest extent not incompatible with the reasons for closure." *Newman*, 696 F.2d at 802; *see also United States v. Rosenthal*, 763 F.2d 1291, 1293 (11th Cir. 1985) (recognizing "presumptive common law right to inspect and copy judicial records.")

### A. The Burden To Overcome Public Access Must be Met For Each Sealed Record.

In order to cut off public access to criminal court records, the party seeking to do so must overcome the presumption of access by establishing a compelling interest justifying a seal that is no broader than necessary to serve that interest. *See Ochoa-Vasquez*, 428 F.3d at 1030. A court considering a motion to seal court records must articulate the overriding interest along with specific findings. *Id.* Because this analysis must be conducted on a record-by-record basis, the Court must consider whether the disclosure of each individual filing in this case would compromise the party's asserted interest. *See, e.g., id.* (assessing several orders sealing specific documents and holding that they violated the First Amendment "because no finding was made on the record to rebut the presumption of openness.").

The Local Rules of this Court reinforce these stringent requirements. For instance, the Local Rules recognize that "proceedings in the United States District Court are public and Court filings are matters of public record." Local Rule 5.4(a). Further, the rule provides that "[a] party seeking to make a filing under seal in a criminal case shall . . . [c]onventionally file a motion to seal that sets forth the factual and legal basis for departing from the policy that Court filings be public and that describes the proposed sealed filing with as much particularity as possible without

11

revealing the confidential information." Local Rule 5.4(c). The rule envisions that any sealing must be limited not only in scope, but also *duration*. *Id*. ("The motion shall specify the proposed duration of the requested sealing.") (emphasis added).

Even if a party in this case could establish a compelling reason to justify a continued seal of any specific records, this Court would still have to consider the proper scope of that seal and whether alternatives to total closure exist. *See Newman*, 696 F.2d at 802 ("Less intrusive alternatives must be considered."). For example, this Court should consider whether the redaction of limited information would serve to protect any established compelling interest.

There can be no justification for the continued seal of the Complaint in this case because it has already been made public. As the Fourth Circuit observed in discussing the overbreadth of orders sealing criminal court records in *In re State-Record Co., Inc.*, 917 F.2d 124, "[o]verbreadth is also obvious from the fact that . . . documents filed in the Clerk's Office prior to the date of the gag order have been sealed, although their content and substance were made public at the time of filing." *Id; see also U.S. v. Peterson*, 627 F.2d 1359, 1373 (M.D. Ga. 2008) (recognizing that "whether the press has already been permitted substantial access to the contents of the records" must be considered in determining whether to allow access to judicial records). Any order permitting the previously publicly-available Complaint in this matter to remain sealed necessarily would constitute overbreadth.

**B. The Public Interest Is Particularly High and Favors Access.**

Where the public's interest in a particular proceeding is high, that consideration weighs heavily in any balance between competing access rights and secrecy concerns. *See, e.g., Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246 (11th Cir. 2007) ("In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts

consider...whether the information concerns public officials or public concerns...."); *United States v. Beckham*, 789 F.2d 401, 413 (6th Cir. 1986) ("[W]hen the conduct of public officials is at issue, the public's interest in the operation of government adds weight in the balance toward allowing permission to copy judicial records."); *United States v. Edwards*, 672 F.2d 1289, 1294 n.11 (7th Cir. 1982) ("there is a strong presumption in support of the common law right to inspect and copy judicial records," particularly where "the trial bore upon the conduct of a public official").

Here, there is no doubt that the public's interest and concern about the conduct and integrity of elections is at an all-time high in the wake of the 2020 election and as the country approaches another presidential election in 2024. The conduct of voting technology companies such as Smartmatic has obviously been forefront in this public debate, and whether and to what extent Smartmatic is involved in alleged criminal activity in the United States[4] and abroad is directly relevant. *See supra* note 2. As the COMELEC Resolution observes, the allegations in this case, which are of "public knowledge," "tend to cause speculation and distrust in integrity of the electoral process" and "threaten to erode the public's confidence in the electoral system." Ex. B, at 14. Indeed, the Defendant's alleged actions, particularly as to the potential exploitation of his position with COMELEC to obtain bribes from entities that are in the business of providing vital election technology, along with the Homeland Security's decision to pursue and file a complaint against Defendant, are therefore of core public concern.

---

[4] The Complaint, for instance, notes that Smartmatic executives and/or agents acted in furtherance of the alleged scheme while in Florida, further amplifying the need for U.S. citizens to see the docket and documents. ECF No. 1, at ¶¶ 19, 24, 50, 57, 65, n.8.

## CONCLUSION

For the foregoing reasons, the proposed intervenor, OAN, respectfully requests that this Court enter an Order granting it leave to intervene in this matter and unsealing the docket and all records presently under seal in this matter.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), the proposed intervenor, OAN, requests an expedited hearing be set for this motion. Oral argument will aid this Court in assessing any further basis to continue to keep these newsworthy records secret and allow this Court to directly inquire into any government justification for doing so. OAN estimates the time required for argument to be thirty (30) minutes.

## LOCAL RULE 7.1(a)(3) CERTIFICATE OF GOOD-FAITH CONFERENCE

Undersigned counsel for OAN (Dana J. McElroy) certifies that on December 8 and 11, 2023, she attempted to confer via telephone and email with Assistant United States Attorney Robert J. Emery concerning the relief sought in this motion. Mr. Emery responded on December 11th and advised that, as a general matter, the government does not comment on any possible matters that are not public and under seal. Additionally, because the case docket currently is sealed, counsel is unaware of whether Defendant Bautista is represented by counsel, and if so, counsel's identity and/or contact information.

Dated: December 11, 2023

Respectfully submitted,

THOMAS & LOCICERO PL

By: /s/ *Dana J. McElroy*
Dana J. McElroy
Florida Bar No. 845906
dmcelroy@tlolawfirm.com
Daniela B. Abratt
Florida Bar No. 118053

14

dabratt@tlolawfirm.com
915 Middle River Drive, Suite 309
Fort Lauderdale, FL 33304
Phone: (954)703-3416

-and-

James J. McGuire
Florida Bar No. 187798
jmcguire@tlolawfirm.com
Linda R. Norbut
Florida Bar No. 1011401
lnorbut@tlolawfirm.com
601 South Boulevard
Tampa, FL 33606
Phone: (813) 984-3060

*Attorneys for Herring Networks, Inc. d/b/a
One America News Network*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of December, 2023, I filed the foregoing

document with the Clerk of the Court, and served a copy via electronic mail on this same date

upon:

    Robert J. Emery
    Assistant United States Attorney
    Southern District of Florida
    99 NE 4th Street, Seventh Floor
    Miami, Florida 33132
    Robert.emeryz@usdoj.gov.

                                        /s/ Dana J. McElroy
                                        Attorney

15

# COMPOSITE EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:23-mj-03829 LOUIS

UNITED STATES OF AMERICA

vs.

JUAN ANDRES DONATO BAUTISTA,

Defendant.

_____/

FILED BY ____TS____ D.C.

**Sep 19, 2023**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   NO

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   NO

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?                                                              NO

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:   _Robert J. Emery_
Robert J. Emery
Assistant United States Attorney
Southern District of Florida Court
No. A5501892
99 N.E. 4th Street, 7th Floor
Miami, Florida  33132
Tel.:  305-961-9421
Fax:  305-536-7213
Email: Robert.emery2@usdoj.gov

AO 91(Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) Case No. **1:23-mj-03829 LOUIS** |
| Juan Andres Donato Bautista, | ) |
|  | ) |
|  | ) |

*Defendant.*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____July 2015 to October 2017____ in the county of ____Miami-Dade____ in the
____Southern____ District of ____Florida____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), and 1957(a), all in violation of 18 U.S.C. § 1956(h) |
| 18 U.S.C. § 1956(a)(2)(A) | Promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) |
| 18 U.S.C. § 1956(a)(2)(B)(i) | Concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i) |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Colberd Almeida, Special Agent - HSI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time.

Date: **September 19 2023**

_____
*Judge's signature*

City and state: ____Miami, Florida____

Hon. Lauren F. Louis, United States Magistrate Judge
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### FOR A CRIMINAL COMPLAINT

I, Colberd Almeida, being first duly sworn hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a Complaint charging Juan

Andres "Andy" Donato Bautista ("BAUTISTA") with conspiring to launder monetary instruments

and conspiring to engage in monetary transactions in property derived from specified unlawful

activity, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), and 1957(a), all in violation

of 18 U.S.C. § 1956(h); and laundering and attempted laundering of monetary instruments, in

violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(a)(2)(B)(i) (collectively referred herein as the

"Criminal Offenses").

2.      I am a Special Agent with the U.S. Department of Homeland Security's Homeland

Security Investigations ("HSI"). I have been employed in this capacity since March 2003. As

such, I am an investigative or law enforcement officer of the United States within the meaning of

Section 2510(7) of Title 18 of the United States Code. That is, I am an officer of the United States

who is empowered by law to conduct investigations of, and to make arrests for, offenses

enumerated in Title 18, United States Code, Section 2516(1).

3.      Since 2017, I have been assigned to the HSI Miami Field Office's Illicit Proceeds

and Foreign Corruption ("IPFC") Group, a group that investigates money laundering and foreign

corruption. In my role as a Special Agent, and particularly while working within the IPFC Group,

I have received training and gained experience related to investigations involving foreign

corruption, money laundering, fraud, and other financial crimes – including, but not limited to:

conducting or participating in surveillance and undercover operations; obtaining and executing

search and seizure warrants and arrest warrants; interviewing witnesses, informants, and

cooperating defendants; and acquiring and analyzing electronic data and communications as well as foreign and domestics business and financial records.  Through my training and experience, I have also become familiar with various money laundering methods that persons engaged in such criminal activity take to avoid detection from law enforcement, including making payments through third parties or utilizing offshore shell companies or bank accounts to conceal the nature and origin of the funds; creating false documentation, such as a loan or a contract agreement, to give the appearance of legitimacy to an illegal payment; structuring payments to avoid bank or regulatory reporting requirements; and using coded language to hide the criminal nature of communications.

4.      In addition, from approximately May 2001 through February 2003, I was employed by HSI's legacy agency, the United States Customs Service, as a Special Agent.  I am also a graduate of the Federal Law Enforcement Training Centers in Glynco, Georgia, where I have received training on law enforcement tools and techniques used to investigate violations of federal law – including those involving foreign corruption and money laundering.

5.      The information contained in this affidavit is based on, among other things, my participation in the investigation, information provided by other individuals – including sworn law enforcement officers, foreign law enforcement officials, witnesses, and confidential sources; my review of relevant documents – including foreign and domestic business and financial records as well as email and text communications; and my training and experience as a federal agent and the training and experience of other federal agents.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include each and every fact known to me or learned during the course of this investigation.

2

6.      All dates, times, and amounts stated herein are approximate.  I have summarized conversations of emails and text messages unless otherwise indicated.  Quotations and summaries of emails or messages in Spanish are based on draft translations.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the Criminal Offenses have been committed by BAUTISTA.

### SUMMARY OF RELEVANT DOMESTIC AND FOREIGN STATUTES

8.      Title 18, United States Code, Section 1956(a)(2)(A) prohibits money laundering in the United States involving international transfers and attempted transfers either to or from the United States with the intent to promote the carrying on of a specified unlawful activity.

9.      Title 18, United States Code, Section 1956(a)(2)(B)(i) prohibits money laundering either to or from United States where the transaction or attempted transaction is designed in whole, or in part, to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity.

10.     Title 18, United States Code, Section 1957(a) prohibits money laundering by engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specific unlawful activity.

11.     Title 18, United States Code, Section 1956(h) prohibits conspiracies to violate the offenses defined in Title 18, United States Code, Sections 1956 and 1957.

12.     Title 18, United States Code, Section 1956(c)(7) states that, for a financial transaction occurring in whole or in part in the United States, specified unlawful activity includes an "offense against a foreign nation involving . . . bribery of a public official, or the

3

misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official" and "any felony violation of the Foreign Corrupt Practices Act."

13. Pursuant to the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2 prohibits "domestic concerns"—which include individuals who are citizens, nationals or residents of the United States as well as companies that are incorporated in the United States or have their principal place of business in the United States—or any officer, director, employee or agent of such domestic concern or stockholder acting on behalf of such domestic concern, from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order assist the domestic concern to obtain or retain business for or with, or direct business to, any person. 15 U.S.C. § 78dd-2(a) and (h)(1)(A)-(B).

14. Furthermore, Title 15, United States Code, Section 78dd-3 prohibits any "person"—other than an issuer or a domestic concern—while in the territory of the United States, from corruptly making use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the

4

payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value, to a foreign official or to a person, while knowing that all or part of such money or thing of value would be and had been offered, given, or promised to a foreign official, for purposes of (i) influencing acts or decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do or omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order to assist such person to obtain or retain business for or with, or direct business to, any person. 15 U.S.C. § 78dd-3(a) and (f)(1).

15.     From my review of criminal laws of the Republic of the Philippines (collectively, the "Philippine Penal Code") in effect during the relevant time period, the Philippine Penal Code contains the following provisions, in pertinent part, relating to bribery of a public official:

*Bribery – Revised Penal Code*

a.   Art. 210. *Direct bribery* – Any public officer who shall agree to perform an act constituting a crime, in connection with the performance of his official duties, in consideration of any offer, promise, gift or present received by such officer, personally or through the mediation of another, shall suffer the penalty of *prision mayor* in its medium and minimum periods and a fine of not less than three times the value of the gift in addition to the penalty corresponding to the crime agreed upon, if the same shall have been committed.

b.   Art. 211. *Indirect bribery* – The penalties of *prision correctional* in its medium and maximum periods, suspension and public censure shall be imposed upon any public officer who shall accept gifts offered to him by reason of his office.

5

*Anti-Graft and Corrupt Practices – Republic Act No. 3019*

      c. Section 3. Corrupt practices of public officers. — In addition to acts or omissions of public officers already penalized by existing law, the following shall constitute corrupt practices of any public officer and are hereby declared to be unlawful:

           (b) Directly or indirectly requesting or receiving any gift, present, share, percentage, or benefit, for himself or for any other person, in connection with any contract or transaction between the Government and any other party, wherein the public officer in his official capacity has to intervene under the law. . ..

           (e) Causing any undue injury to any party, including the Government, or giving any private party any unwarranted benefits, advantage or preference in the discharge of his official administrative or judicial functions through manifest partiality, evident bad faith or gross inexcusable negligence. This provision shall apply to officers and employees of offices or government corporations charged with the grant of licenses or permits or other concessions.

## BACKGROUND

*Philippine Official and Related Entities*

     16.    The Commission on Elections ("COMELEC") of the Republic of the Philippines (the "Philippines") was an independent agency mandated to enforce and administer election laws in the Philippines.  COMELEC was a "department," "agency," or "instrumentality" of the Philippines as those terms are used in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

     17.    BAUTISTA served as the Chairman of COMELEC from on or about April 28, 2015, to in or around October 2017. BAUTISTA was a "foreign official" as that term is defined in the FCPA, 15 U.S.C. §§ 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

*United Kingdom Companies, U.S. and Philippine Subsidiaries, Employees and Associates*

18.　　Company 1, headquartered in the United Kingdom, was a holding company that funded subsidiaries, including Company 2 and Company 3.

19.　　Company 2 was an election voting machine and service provider company that was privately held under the Company 1 parent corporate structure. Company 2 had offices world-wide and was headquartered in the United Kingdom. During the time of the Criminal Offenses, Company 2 had at least one employee working and residing in the Southern District of Florida.

20.　　Company 3, a subsidiary of Company 1 and Company 2, was located and headquartered in Boca Raton, Florida. Company 3 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

21.　　Company 4 was a joint-venture and subsidiary of Company 1 and Company 2, that was formed in the Philippines in 2015 to bid for contracts relating to the 2016 elections in the Philippines, as set forth below. The joint venture included, among others, Company 2 and Vendor A (described below).

22.　　In or around the later part of 2015 and into 2016, Company 4 won bids for three contracts worth a total approximate value of one hundred ninety-nine million dollars ($199,000,000) to supply COMELEC with voting machines and related services for the May 2016 elections for President, Vice-President, and other official positions.[1]

23.　　Co-Conspirator 1 was a co-founder and President of Company 2. Co-Conspirator 1 also served on the Board of Directors for Companies 1 and 2. Co-Conspirator 1 maintained a

---

[1] All dollar amounts referenced herein are estimates in U.S. dollars (USD), unless otherwise indicated.

7

residence in the Southern District of Florida since in or around 2009. He became a lawful permanent resident of the United States in or around January 2019. Co-Conspirator 1 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

24.     Co-Conspirator 2 worked as Executive Vice-President for Companies 2 and 3 in Boca Raton, Florida. Company 3 paid his salary. He managed hardware development and manufacturing—worldwide—for Company 2. Co-Conspirator 2 became a United States citizen in 2004 and he maintained a residence in the Southern District of Florida since 1993. Co-Conspirator 2 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

25.     Co-Conspirator 3 was a Company 2 executive involved in Company 4's contracts with COMELEC in the Philippines. He served as project manager for Company 4 in the Philippines who signed and implemented the 2016 election contracts. Co-Conspirator 3 was a "person" as that term is used in the FCPA, 15 U.S.C. § 78dd-3(a) and (f)(1).

26.     Co-Conspirator 4 lived in Panama, and he had a business relationship with Company 2 and its subsidiaries. Co-Conspirator 4 was a "person" as that term is used in the FCPA, 15 U.S.C. § 78dd-3(a) and (f)(1).

*Taiwanese Company, Employees, and Related Shell Companies*

27.     Vendor A was a company based in Taiwan that manufactured hardware for electronic products for Companies 2, 3, and 4. Vendor A partnered with Company 2 to form the joint venture—Company 4—that bid on and was awarded contracts to supply voting machines and related services to the Philippines for its 2016 elections.

28.     Vendor A-President was president and owner of Vendor A.

8

29.     Vendor A-Employee was a director/officer and shareholder of Vendor A. Vendor A-Employee was a close relative of Vendor A-President.

30.     Baumann Enterprises Limited ("Baumann") was a foreign shell company incorporated in the British Virgin Islands in or around 2010. BAUTISTA as well as two close relatives owned and/or were beneficial owners of Baumann.

31.     Shell Company X was a foreign shell company incorporated in Anguilla in or around 2014. Vendor A-President owned and exercised control over Shell Company X.

32.     Shell Company Y was a foreign shell company incorporated in Brunei in or around 2011. Vendor A-Employee was listed as a director of Shell Company Y and the primary account user for Shell Company Y's bank account in Hong Kong. Vendor A-President owned and exercised control over Shell Company Y.

*Related Philippine Entities*

33.     Philippine Metals Company was a company incorporated in the Philippines in or around 1994. Philippine Metals Company purported to be, among other things, an exporter, importer, and manufacturer of metals and metal products.

34.     Philippine MSB Company was a registered money services business ("MSB") incorporated in or around 2010 that operated in the Philippines.

## OVERVIEW OF THE SCHEME TO PAY BRIBES TO BAUTISTA

35.     In or around August 2017, BAUTISTA's wife informed Philippine National Bureau of Investigation ("NBI") agents that her husband had large amounts of unexplained wealth.[2]    She informed NBI's Anti-Fraud Division that her husband had approximately one

---

[2] The NBI is an agency of the Philippine government under the Philippine Department of Justice, responsible for handling and solving major high-profile or complex criminal cases in the interest of the nation.

billion Philippine Pesos, or approximately $20 million USD, of "ill-gotten wealth." At their residence, she found foreign bank account information for Baumann, Shell Company X and Shell Company Y, that she previously did not know existed. Additionally, at the residence, BAUTISTA's wife also discovered stacks of cash of Philippine pesos and approximately thirty-five (35) "Passbooks" identifying multiple cash deposits at bank accounts in the Philippines held in BAUTISTA's and family members' names that she previously did not know about.

36.     Based, in part, on this information, HSI initiated an investigation that focused on employees of Companies 2, 3, and 4 and their use of various overseas bank accounts of the Companies' vendor to bribe BAUTISTA—a Philippine government official—for lucrative election voting machine and related services contracts with COMELEC for the 2016 Philippine elections. In addition, the investigation focused on BAUTISTA's acts to launder his bribe proceeds related to the scheme.

37.     As described in greater detail below and summarized in the attached flow chart, BAUTISTA, in his capacity as Chairman of COMELEC, received and attempted to receive bribes from Co-Conspirators 1, 2, 3, 4, and Vendor A, in exchange for using his position as Chairman of COMELEC to assist Company 2, Company 4, and others to obtain and retain business and improper advantages, including payments from COMELEC, in violation of the FCPA and the Philippine laws against the bribery of a public official. Co-Conspirators 1, 2, 3, and 4 furthered the criminal scheme using personal email accounts and messaging applications to avoid detection, and in particular, Co-Conspirators 1 and 3 used email accounts registered under aliases.

38.     To conceal and disguise the bribe payments, Co-Conspirators 1, 2, 3, 4, and Vendor A-President, together with others, caused or attempted to launder at least $4,000,000

10

through foreign and U.S. bank accounts for the benefit of BAUTISTA, in violation of U.S. money laundering laws.

### THE BRIBERY AND MONEY LAUNDERING SCHEME

39.     From my review of emails, text messages, contracts, documents, bank records, witness interviews, and from my participation in this investigation, I have learned, among other things, the following:

40.     From on or about April 28, 2015, to in or around October 2017, BAUTISTA, as Chairman of COMELEC, had influence and decision-making authority relating to the awards, oversight, and payments for three contracts to supply COMELEC with voting machines and related services for the May 2016 elections for President, Vice-President, and other official positions. As a government official, BAUTISTA was required to file a yearly Sworn Statement of Assets, Liabilities and Net Worth ("SALN"). For 2015 and 2016—the years that BAUTISTA was required to file a SALN as COMELEC Chairman—he failed to list his interest in Baumann.

41.     In or around October 2014, COMELEC opened the bidding process for the lease of, with the option to buy, 23,000 election machines and related services for the 2016 elections ("Contract 1"). On or about July 30, 2015, BAUTISTA, in his capacity as COMELEC Chairman, awarded the bid for Contract 1 to Company 4, the joint venture that included Company 2 and Vendor A. Co-Conspirator 3, on behalf of Company 4, and another COMELEC commissioner, on behalf of COMELEC, signed Contract 1 because BAUTISTA was unavailable. For Contract 1, COMELEC agreed to pay Company 4 approximately $53,763,481, in installments, and upon Company 4 meeting certain milestones during the contract. Per the contract, only when BAUTISTA, or his designee, certified that Company 4 had met a milestone could COMELEC issue a payment to Company 4.

11

42.    In or around May 2015, COMELEC opened the bidding process for the lease of, with the option to buy, 70,977 election machines and related services ("Contract 2"). On or about August 27, 2015, COMELEC awarded the bid for Contract 2 to Company 4. BAUTISTA, as COMELEC Chairman, and Co-Conspirator 3, on behalf of Company 4, signed Contract 2. For Contract 2, COMELEC agreed to pay Company 4 approximately $134,670,877, in installments, and upon Company 4 meeting milestones during the contract. Per the contract, only when BAUTISTA, or his designee, certified when Company 4 had met a milestone could COMELEC issue a payment to Company 4.

43.    In or around March 2015, COMELEC opened the bidding process for services related to transmission of results for the 2016 elections ("Contract 3"). On or about February 9, 2016, COMELEC awarded the bid for Contract 3 to Company 4 for the 2016 Philippine elections. BAUTISTA, as COMELEC Chairman, and Co-Conspirator 3, on behalf of Company 4, signed Contract 3. For Contract 3, COMELEC agreed to pay Company 4 approximately $10,642,488, in installments, and upon Company 4 meeting milestones during the contract. Per the contract, only when BAUTISTA, or his designee, certified when Company 4 had met a milestone could COMELEC issue a payment to Company 4.

*Company 2 Created Slush Funds in the Philippines and Hong Kong*

44.    Based on my training and experience and my involvement in this investigation, I believe that to effectuate their criminal scheme to obtain the 2016 Philippine election contracts, Co-Conspirators 1, 2, 3, 4, and others, created "slush funds" in the Philippines, Hong Kong, and elsewhere.

12

A.   **First Slush Fund**

45.   In or around 2014, a Company 2 subsidiary executed a two-million-dollar contract with Vendor A to design election equipment for the 2016 Philippine elections. As noted above, around this time, COMELEC had announced the bidding for Contract 1. Regarding the importance of the Philippines contracts to Companies 1 and 2, Co-Conspirator 2 told a former president of Vendor A that Co-Conspirator 2's bosses, which included Co-Conspirator 1, were **"seriously considering in closing [sic] the company (Worldwide!!!) next year** if we cannot apply, compete, and win the Philippines bid!" (bold and underline in original). Company 2 advanced funds and paid Vendor A a total of two million U.S. dollars pursuant to the contract. A large of amount of these funds went unused by Vendor A. Based on my training and experience, the pool of excess funds which were not returned to the company, but were transferred to shell companies, indicates that the original contract was over-invoiced to create a slush fund. In an email to Vendor A, Co-Conspirator 2 wrote that he needed to check with his "boss" as to whom and where to send the excess of $1,000,000. At the time, Co-Conspirator 1 supervised Co-Conspirator 2. Instead of returning the money to Company 2 and/or its subsidiary, Co-Conspirator 2 directed Vendor A to transfer large amounts of U.S. dollars from Shell Company X and Shell Company Y through foreign and U.S. bank accounts, to various Swiss bank accounts of shell companies owned by Co-Conspirator 1 based on fictitious contracts.[3]

---

[3] Notably, in or around June 2017, from one of these shell companies' bank accounts in Switzerland, Co-Conspirator 1 directed a funds transfer of approximately $1.3 million to a bank account in the United Arab Emirates that belonged to a company Co-Conspirator 4 owned. In or around July 2017, Co-Conspirator 4 then directed a wire transfer to a company's bank account in the Philippines.

## B.    Second Slush Fund

46.    In relation to the creation of another slush fund, the Co-Conspirators funneled funds through Co-Conspirator 4's companies.  On or about December 15, 2015, Co-Conspirator 4 sent an email with an attached spreadsheet entitled "Philippines Pot" (translated from Spanish) to Co-Conspirator 3 at a personal email account.[4]  The spreadsheet attached to Co-Conspirator 4's email listed multiple payments to Co-Conspirator 4 totaling $2,340,000 from Company 2. The spreadsheet recorded various U.S. dollar denominated payments Co-Conspirator 4 appears to have made from his personal and business bank accounts to bank accounts of several Philippines companies, including Philippine MSB Company.  In the spreadsheet, Co-Conspirator 4 projected to receive $3,657,500 from Company 2.  As discussed below in Paragraph 65, the Co-Conspirators used the same Philippine MSB Company bank account to funnel payments to BAUTISTA.

47.    According to bank documents obtained during the investigation, Co-Conspirator 4 executed some of the wire transfers to bank accounts of Philippine companies, including Philippines MSB Company, on the same day or soon after he received payments from Company 2.  Many of the payments predated the awards of Contracts 1, 2, and 3, but occurred after the bidding processes for the Contracts were opened.  Co-Conspirator 4 and his companies identified during this investigation were not on a list of vendors for Companies 2, 3, and 4 pertaining to the election voting machine and related services contracts with COMELEC that was provided to U.S. law enforcement by counsel for Companies 2, 3, and 4.

---

[4] Based on my training and experience, and familiarity with this case, I have reason to believe that usage of the terms "Philippines Pot" related to the creation of a slush fund, particularly as the spreadsheet recorded payments from Company 2 as well as outgoing wire transfers from various personal and business accounts in the name of third parties to companies in the Philippines.

48.    Emails lawfully obtained during this investigation indicate that Co-Conspirator 4 created fake contracts to obscure the true source of the funds sent to Philippine bank accounts described above and to conceal the recipient(s) of payments listed in the spreadsheet.  For example, Co-Conspirator 4 recorded a payment dated August 26, 2015, in the spreadsheet to Philippine MSB Company for $72,000. An official from Co-Conspirator 4's bank questioned the wire transfer and requested supporting documentation.  Despite Philippine MSB Company being registered as an MSB, Co-Conspirator 4 provided the bank as supporting documentation for the wire transfer receipts purporting to show that he purchased furniture from Philippine MSB Company.  Co-Conspirator 4 emailed Co-Conspirator 1 expressing concerns about the bank's inquiries, and in response, Co-Conspirator 1 suggested submitting a receipt for services provided or something else to justify the wire transfer and indicated that he thought that this would satisfy the bank because they planned to send more transfers to Philippine MSB Company.  Co-Conspirator 4 responded to Co-Conspirator 1 that he could not do what Co-Conspirator 1 suggested because of the large amount of the transfer and that the transfer originated from his personal account.  After the bank twice rejected supporting documentation for the alleged furniture purchase, Co-Conspirator 4 submitted a completely different justification for the wire transfer—a consulting agreement between himself and Philippine MSB Company that had nothing to do with furniture.

**C.    Third Slush Fund**

49.    Co-Conspirator 2 created the third slush fund from Company 2's 2015 contract with Vendor A to pay Vendor A approximately $56,117,790 to build 98,447 voting machines for the 2016 Philippine elections.  Company 2 and Vendor A generated the slush fund by creating over-invoiced contracts.  The purchase order—#5134—for one of the contracts designated the

15

voting machine the "1800 Plus." An Excel spreadsheet attached to an email located in Vendor A-Employee's personal email account detailed an itemized cost for purchase order #5134 of $570 for each 1800 Plus voting machine. This same spreadsheet included an "Extra Fee" of $50 per machine, and a total "Extra Fee" amount of $4,922,350. The spreadsheet also listed "Extra Fee" for other items apparently related to the 2016 Philippine elections for a total "Extra Fee" amount of $4,961,350. In a March 2016 series of emails, Vendor A-President informed Co-Conspirator 2 that approximately $5,900,000 in unused buffer funds from this contract belonging to Company 2 remained in the bank accounts of Shell Company X and Shell Company Y. Co-Conspirator 2 referred to $4,961,350 of these unused funds as his "boss's" as he had similarly described in an email referenced in Paragraph 45, which I believe was a reference to Co-Conspirator 1, who was Co-Conspirator's 2 immediate supervisor and president of Company 2.[5]

50.     For one of the bank accounts in the Philippines, in email communications lawfully obtained by law enforcement, from in or around May 2016, Co-Conspirator 1 instructed Co-Conspirator 2 to create a contract to support payments to another company—Philippine Metals Company. Co-Conspirator 1 sent Co-Conspirator 2 the articles of incorporation for Philippine Metals Company in support of the scheme to create the false documentation to justify wire transfers to Philippine Metals Company. Co-Conspirator 1 informed Co-Conspirator 2 that Philippine Metals Company was one of the companies they ought to use to send the payments and that they wanted to start with "150k" and to later increase the amounts. Based on my training and experience and my involvement in this investigation, I believe that "150k" refers to $150,000 USD

---

[5] The spreadsheet detailed in this Paragraph likewise contained a $10 cost called the "Rue," with a total amount of $984,470. During this investigation, HSI determined that Vendor A-President wired a portion of the "Rue" funds from Shell Companies X and Y to bank accounts in the Southern District of Florida belonging to Co-Conspirator 2 and another Company 3 employee.

and later increases to that amount when referring to making future payments. Co-Conspirator 1 also told Co-Conspirator 2, who received the email in Southern District of Florida, "to create" the contract that would be needed to support the wire transfers.

51.     Later in May 2016, Co-Conspirator 3, using an alias email account, forwarded a contract to Co-Conspirator 1, who in turn emailed it to Co-Conspirator 2. The contract detailed four payments from Shell Company X to Philippine Metals Company for a total of $1,350,000 and was for the fictitious purchase of iron ore and copper from Philippine Metals Company.

52.     In a series of emails from in or around June 2016 to in or around July 2016, Co-Conspirator 2 informed Co-Conspirator 1 that approximately $750,000 had been sent to Philippine Metals Company from Shell Company X's bank account. During the same time period, Co-Conspirator 1 instructed Co-Conspirator 2 not to make any more payments because they were owed something.[6] In a subsequent email exchange, Co-Conspirator 1 informed him that they had started getting paid so Co-Conspirator 2 could move forward on the payment. On or about August 20, 2016, Co-Conspirator 2 emailed Co-Conspirator 1 informing him that all payments had been completed to Philippine Metals Company.

53.     My review of the contract between Philippine Metals Company and Shell Company X described above and related email communications revealed several irregularities. First, the 2016 contract contained an annex which detailed the purported sale of iron ore, yet the delivery dates for the iron ore per the contract referenced the years 2008 and 2009. Second, according to export records received from the Philippines, Philippine Metals Company never exported any

---

[6] Notably, around this time, Company 4 was awaiting payments by COMELEC on Contracts 1, 2, and 3. As indicated above, pursuant to the contracts, BAUTISTA, or his designee, had to first sign a milestone certification to trigger the issuance of a payment by COMELEC.

17

goods to Shell Company X in 2016. Third, at no time did Co-Conspirators 1, 2 and 3 use their company employee email accounts to facilitate these transactions. Lastly, in my review of bank records for Philippine Metals Company, almost immediately after the funds were sent from Shell Company X to Philippine Metals Company, wire transfers in the same or similar amounts were sent from Philippine Metals Company to Philippine MSB Company. In my training and experience, I believe this is a common money laundering method known as layering that is used to disguise the origin, destination, and true purpose of the funds transfer. As explained in the following paragraphs, the Co-Conspirators later used Philippines Metals Company and Shell Companies X and Y to funnel payments to BAUTISTA.

*Bribe Payments to BAUTISTA*

54.     As described in more detail below, Company 2, Company 3, and Company 4 employees – including Co-Conspirators 1, 2, and 3 – directed or caused Vendor A-President to send bribe payments from the third group of slush funds held in Shell Company X and Shell Company Y bank accounts, which Vendor A-President controlled, to BAUTISTA's bank account in the name of Baumann at a bank in Singapore. Co-Conspirators 1, 2, 3, and Vendor A-President disguised these payments totaling $1 million to BAUTISTA as fictitious loans to Baumann, a company located outside of the Philippines, while BAUTISTA was Chairman of COMELEC. Again, Company 2 employees and Vendor-A created this slush fund related to the Philippines 2016 elections through over-invoicing.

55.     In an email dated August 12, 2016, Co-Conspirator 2 wrote Vendor A-President that they "will move 1 MM as a 'loan' to a Virgin Island Company." On August 15, 2016, with the subject line "Re:4th Item – LOAN," Vendor A-President suggested to Co-Conspirator 2 to use the third fund from Shell Company X and Shell Company Y to pay the "loan." Based on my

18

training, experience, and overall familiarity with this investigation, payments from the third slush fund referenced in Paragraph 49, in part, were disguised as "loans" to pay bribes to BAUTISTA through Baumann, a shell company incorporated in the British Virgin Islands. The following were examples of some of those wire transfers to BAUTISTA:

### A.    August 16, 2016 Attempted Transfer of $500,000 for the Benefit of BAUTISTA

56.    On or about August 16, 2016, Co-Conspirator 2 directed Vendor A-President, via electronic messaging, to transfer $500,000 from Shell Company Y's bank account in Hong Kong to Baumann's bank account in Singapore. According to bank records, BAUTISTA was identified through Baumann's Articles of Incorporation as a beneficial owner of the company and as a signatory on Baumann's bank account in Singapore. The wire transfer instructions listed "D.L." at a Singapore bank as the point of contact for the transfer and listed the purpose of the wire transfer as "LOAN AGREEMENT 2016." The wire instructions also listed a bank in New York as the intermediary for the wire transfer. The purported loan contract between Baumann and Shell Company Y to justify the wire transfer, included a signature that appears to be that of a known close relative of BAUTISTA, who signed the contract on behalf of Baumann. Based on, among other things, electronic messages that I have reviewed between the Conspirators, there is good cause to believe this loan contract was not legitimate and was intended to disguise the true nature of the above-referenced transfer, which was a bribe payment to BAUTISTA. Vendor A-President sent the $500,000 wire transfer, and it passed through an intermediary bank in New York. However, this wire transfer never arrived at Baumann's bank account due to an issue at the originating bank. As discussed below, the Co-Conspirators re-sent this $500,000 to Baumann on August 29, 2016.

19

57.     Prior to the August 16th wire transfer, on or about August 10, 2016, Co-Conspirator 1 texted Co-Conspirator 2, while Co-Conspirator 2 was in the Southern District of Florida, indicating that he (Co-Conspirator 1) drafted the loan contract because there was a lot of pressure to make the payment—which, based on the context of the conversation as well as my training, experience and involvement in the case, I believe to refer to pressure from BAUTISTA—and that they had to execute the purported loan contract to effectuate the payment.[7] Co-Conspirator 2 responded that he would send the wire transfer next week, but that he had not sent the wire transfer yet as he was a little scared about doing so because the wire transfer involved "this country" and the country could be a "pain." Based on my training and experience, Co-Conspirator 2 referenced the United States when he wrote "this country" because he resided in the United States at the time. In a subsequent email to Co-Conspirators 1 and 2, dated August 11, 2016, Co-Conspirator 3 attached a draft loan agreement for $1,000,000 between Baumann and Shell Company X. In a text conversation dated August 15, 2016, Co-Conspirator 1 told Co-Conspirator 2 that Co-Conspirator 3 sent Co-Conspirator 2 the wire instructions and that they were getting paid so they could immediately execute the "loan." In a text message sent from Co-Conspirator 2 to Co-Conspirator 1, on or about August 15, 2016, while Co-Conspirator 2 was located in the Southern District of Florida, Co-Conspirator 2 stated that the wire transfer was a lot of money to send, so he may have to break up the wire transfer into "500" for each transfer. Based on my training and experience and my involvement in this investigation, this comment referred to the one-million-dollar transfer payment that Co-Conspirator 1 wanted to send, and that it would have to be sent in two payments of $500,000 each in order to avoid scrutiny from

---

[7] Discussed *infra*, BAUTISTA and a close relative purchased a residence in San Francisco, California on August 31, 2016.

the bank(s) involved in the transaction.  Co-Conspirator 1 then instructed Co-Conspirator 2 by text message, dated August 15, 2016, to send the wires urgently as the pressure to send the payment was "horrible."

58.     In a text conversation the next day, on or about August 16, 2016, Co-Conspirator 2 told Co-Conspirator 1 that the one-million-dollar loan payment had to be divided into two loan payments with "500" being "lent" by Shell Company X and "500" by Shell Company Y.  In summary, Co-Conspirator 2 explained that the wire transactions had to be separated so that they fell in different weeks and explained this was because it was a lot of "salsa" to send to the "north." Based on my training and experience, the context in which the terms were used and my knowledge of the case, I believe that the term "north" refers to the United States and "salsa," refers to money, and that the Co-Conspirators were discussing dividing the payment into two smaller payments to help avoid drawing suspicion from authorities or banks in the United States.

59.     In an email exchange from on or about August 16, 2016, to on or about August 17, 2016, between Co-Conspirators 1, 2, and 3, Co-Conspirator 2 informed Co-Conspirators 1 and 3 that "in order to minimize the risk for the Lenders, the loans will come from 2 different companies for 500,000 US$ each."  Co-Conspirator 3 asked, "Cant [sic] they both be done on Wednesday?"  Co-Conspirator 2 responded, "[U]nfortunately the amount is too big to transfer the same day.  Please see attached confirmation for the first loan of 500K.  PS: Please send me the loan agreements signed!"  Co-Conspirator 3 replied, "I though [sic] we could have it signed by a fictitious name, and in that case, somebody there could sign.  Isn't that the case anymore?"

**B.     August 22, 2016, Attempted Transfer of $500,000 for the Benefit of BAUTISTA**

60.     On or about August 22, 2016, the Co-Conspirators sent a second wire transfer of approximately $500,000 for a fictitious loan, per documents provided to the bank to justify the

wire transfer, from an account in Hong Kong in the name of Shell Company X, through a U.S. correspondent bank in New York, to BAUTISTA's Baumann bank account in Singapore. Again, the wire transfer instructions listed "D.L." at the bank as the point of contact for the transfer and the justification for the transfer was listed as "BUSINESS LOANS." A signature on the loan contract on behalf of Baumann submitted to a bank in support of the wire transfer again appears to be that of a known close relative of BAUTISTA. As with the other wire transfer, it passed through an intermediary bank in New York, but this wire transfer never arrived at Baumann's bank account due to the same issue at the originating bank. As discussed in Paragraph 63, the Co-Conspirators resent the $500,000 to Baumann on August 31, 2016.

      **C.**     **August 29, 2016, Transfer of $499,975 for the Benefit of BAUTISTA**

      61.     As set forth above, the Co-Conspirators sent two $500,000 payments from Shell Companies X and Y that passed through the United States financial system but never arrived at BAUTISTA's Baumann bank account in Singapore due to the issues referenced above. Text messages from approximately in or around August 2016 through in or around September 2016, between Co-Conspirator 2 and Vendor A-President corroborate this information. For instance, in these messages, Co-Conspirator 2 and Vendor A-President discussed the problems that they encountered with the wire transfers and that the bank(s) involved in the wire transactions returned both payments. In the text messages described above, Vendor A-President confirmed that a bank returned the funds and that he would resend the funds to Baumann's bank account at the bank in Singapore.

      62.     After the above-described text message exchange, based on bank account information obtained by law enforcement, on or about August 29, 2016, Vendor A-President sent to BAUTISTA's bank account in Singapore, in the name of Baumann, approximately $499,975,

from Shell Company X, to the attention of "D.L." and for "BUSINESS LOANS." This wire

transfer passed through a U.S. correspondent bank in New York. In the text messages described

above, Co-Conspirator 2 confirmed that the beneficiary—whom, based on the context of the

conversation as well as my training, experience, and involvement in the case, was BAUTISTA—

received the wire transfer. Bank records also verified that this wire transfer arrived in

BAUTISTA's bank account held in the name of Baumann in Singapore.

**D.      August 31, 2016, Transfer of $500,000 for the Benefit of BAUTISTA**

63.      Based on bank documents obtained by law enforcement, on or about August 31,

2016, Vendor A-President resent BAUTISTA's Baumann bank account in Singapore

approximately $500,000 from Shell Company Y to the attention of "D.L.," with the justification

of "LOAN AGREEMENT 2016." Again, this wire transfer passed through a U.S. correspondent

bank in New York. In a text message, Co-Conspirator 2 confirmed to Vendor A-President that

the beneficiary—whom, based on the context of the conversation as well as my training,

experience, and involvement in the case, I believe to be BAUTISTA—received the wire transfer.

Bank records also verified that this wire transfer arrived in BAUTISTA's bank account held in

the name of Baumann in Singapore.

*Bribe Payments Redirected to BAUTISTA by Philippine Companies*

64.      Based on my review of emails, some written in Spanish, and bank records received

from BAUTISTA's bank in Singapore, I learned that BAUTISTA's bank account held in the name

of Baumann ultimately received approximately $1,000,000 (two wire transfers of approximately

$500,000 each) from Co-Conspirators 1, 2, 3, and Vendor President-A through Shell Companies

X and Y. However, after the funds arrived in the account, compliance officials at BAUTISTA's

bank requested supporting documentation for the wire transfers from Shell Companies X and Y.

Ultimately, the account holder, BAUTISTA, failed to convince bank officials that the wire transfers were legitimate through supporting documentation and the bank returned both wire transactions to Vendor A-President's bank accounts for Shell Companies 2 and 3, in October 2016. For reasons discussed in the following paragraphs and based on my experience in foreign corruption and money laundering matters, I have learned that the Co-Conspirators resent the funds using Philippine companies to BAUTISTA.

65.     After banking officials at BAUTISTA's bank directed the return of the $1,000,000 to Shell Companies X and Y in October 2016, Co-Conspirator 2 directed Vendor A-President to wire these funds in another way to mask the origin and destination of the funds. From in or around December 2016 through in or around February 2017, the Co-Conspirators redirected these funds, including approximately $900,000, through Philippine Metals Company to Philippine MSB Company's bank account.[8]  On or about December 6, 2016, Co-Conspirator 2 emailed Vendor A-President the following:

> Remember the 2 500's T/T returned?
> We need to pay that 1MM to [Philippine Metals Company].
> You did some transfers before to them, so you should have all the information; the contract is still valid so I think it should not be a problem to pay them.
> Please let me know what do you need in order to start sending the payments...
>
> I suggest to send as follows:

---

[8]  In another email sent in early March 2017, Vendor A-President, at the direction of Co-Conspirators 2 and 3, wired the remaining $100,000 as a "donation" to an organization in the Philippines. Based on training and experience, the totality of the evidence shows that this was not a "donation"; rather it was another bribe to BAUTISTA given that in the email conversation, Co-Conspirator 2 and Vendor A-President discussed resending the rejected $1,000,000 intended for BAUTISTA's Baumann, to Philippine Metals Company and a "donation" to an organization. They discussed wiring $900,000 to Philippine Metals Company and $100,000 as a "donation." The payments to Philippine Metals Company and the "donation" totaled approximately $1,000,000. Additionally, Co-Conspirator 2 sent Vendor A-President a letter from the Philippine organization thanking Shell Company Y for the $100,000 donation a week before Vendor A-President had even wired the funds.

24

WED 07DEC 297,500$
FRI 09DEC 262,700$
TUE 12DEC 268,800$
THU 14DEC 171,000$

Please let me know...

65.     Based on my training and experience and my involvement in this investigation, I

believe the above communication was a reference to the Co-Conspirators resending the one million

dollars that was intended for BAUTISTA, through a different company.   After sending the

schedule in the preceding paragraph, Vendor A-President sent Co-Conspirator 2 a revised wire

transfer schedule in an email, to which Co-Conspirator 2 replied, "do the first ASAP in order to

calm down the recipient people..." Vendor A-President said he would transfer as soon as he could,

but asked if the Philippines Metals Company could provide an invoice to Shell Company X.

Additionally, the timing of the contract and the irregularities set forth above in paragraph 53,

among other things, confirm that the entire contract between Shell Company X and Philippine

Metals Company—to include the modifications—was not a real contract.  Further, in a prior text

conversation sent, in part, on or about August 15, 2016, from the Southern District of Florida,

between Co-Conspirators 1 and 2, they referenced "metals" and "loan" in the same exchange.

Based on my training and experience and my involvement in this investigation, I know that the

word "metals" was part of the name of Philippine Metals Company and "loan" was a reference to

the justification documentation for the wire transfers to BAUTISTA's bank in Singapore.[9]  Lastly,

in an email account lawfully searched during this investigation, law enforcement discovered a

ledger of payments containing the first name of Co-Conspirator 3, who was the same individual

---

[9] HSI also located a second Excel spreadsheet in Vendor-Employee's email from December 2016
that detailed the "Extra Fee" for purchase order #5134 and subsequent payments from the "Extra
Fee" to Baumann, Philippine Metal Company, and to the organization referenced in Footnote 7.

who signed and executed Contracts 1, 2, and 3 with COMELEC on behalf of Company 4. This ledger contained most of the redirected payments that I have determined were paid to BAUTISTA.

*On or about August 23, 2016, Baumann had wired $960,000 to the United States to Purchase a Residence*

66.    In reviewing emails and bank records obtained during the investigation, as noted above, I have learned that the Co-Conspirators attempted to send $500,000 on August 16, 2016, from Shell Company Y to BAUTISTA's Baumann bank account in Singapore. BAUTISTA, on or about August 18, 2016, emailed "D.L." to inform her about the incoming wire to his account. D.L. was BAUTISTA's relationship manager at the Singapore bank and was identified as a point of contact on the wire transfer instructions referenced above. BAUTISTA attached the same documents about the wire transfer that included the name of D.L. and that the justification for the transfer was "LOAN AGREEMENT 2016," the same description on wire instructions found on Co-Conspirator 2's laptop.

67.    Based on the documents and communications reviewed by law enforcement, BAUTISTA knew at least as early as August 8, 2016, that he would receive funds from the Co-Conspirators. On or about August 8, 2016, BAUTISTA emailed "I.S.," who was his assistant, a Microsoft Word document that had the file name "LOAN AGREEMENT PERSONAL." The email had been forwarded to BAUTISTA and the subject line read "Fw: Draft contract," which indicates that someone had forwarded BAUTISTA this email. However, in the email he forwarded to I.S., BAUTISTA deleted the original sender from the email to I.S. The Microsoft Word document in the email was a draft loan contract between Baumann and Shell Company X. According to the metadata for this Word document, Co-Conspirator 1 created this draft loan contract on or about August 3, 2016. Law enforcement found this same draft loan contract on Co-Conspirator 2's laptop.

26

68.    On or about August 23, 2016, the day after the Co-Conspirators attempted to wire the second $500,000 amount (which later did not go through), $960,000 was wired out of the Baumann account (BAUTISTA's account) to a bank account in New York held in the name of a BAUTISTA family member (Family Member 1).[10]   According to bank records, the payment details for this wire transfer described it as a "Gift."   On or about August 29, 2016, this exact amount—$960,000—was wired out by Family Member 1 of this New York-based bank account to an escrow account for a partial payment for a residence in San Francisco, California that cost $1,279,200. Family Member 1 purchased the residence on August 31, 2016, and was listed as the only purchaser of the residence.

69.    Email communications from July 2016 between BAUTISTA and family members stressed the importance of wiring the funds from the bank account in Singapore directly to Family Member 1, not to the company in charge of the closing for the residence, and to label the wire as a "gift."   In another email, Family Member 1 thanked BAUTISTA for the "most generous gift you've given me this year for my birthday – the opportunity to partner with you on this very large investment."   In a later email that copied BAUTISTA, a family member recommended a real estate agent to use if they ever decided to sell the residence.   Based on my training and experience and involvement in this investigation, I believe that the $960,000 wire transfer for the residence was not a gift, but a joint real estate investment between BAUTISTA and Family Member 1.

---

[10]   According to bank records for Baumann, the account had a negative balance after the $960,000 was sent to Family Member 1.   The evidence suggests that this occurred because based on the conversations described above, BAUTISTA thought that the first two $500,000 wires sent on August 16, 2016, and August 22, 2016, would be credited to his account.   I know this because BAUTISTA forwarded the draft loan agreement to I.S., his assistant, on or about August 8, 2016, and the first wire confirmation to D.L., his relationship manager at the bank on or about August 18, 2016.   After the Co-Conspirators and Vendor A-President resent the two transfers for approximately $500,000 each in late August 2016, the Baumann bank account flipped to a positive balance.

27

### CONCLUSION

70.    Based on the foregoing, your Affiant submits there is probable cause to issue a criminal complaint and arrest warrant charging Juan Andres "Andy" Donato Bautista with conspiring to launder monetary instruments and conspiring to engage in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(2)(B)(i), and 1957(a); all in violation of 18 U.S.C. § 1956(h); and laundering and attempted laundering of monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(a)(2)(B)(i).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Respectfully submitted,

COLBERD ALMEIDA
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this __19__ day of September 2023.

HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE

28



SUMMARY OF BRIBERY SCHEME FLOW CHART

# EXHIBIT B

Republic of the Philippines
**Commission on Elections**
**Office of the Clerk of the Commission**
8th Floor, Palacio del Gobernador
Intramuros, Manila

## EN BANC

IN THE MATTER OF THE PETITION TO
REVIEW THE QUALIFICATIONS OF
SMARTMATIC PHILIPPINES, INC. AS A
PROSPECTIVE BIDDER IN VIEW OF ITS
FAILURE IN THE 2022 ELECTIONS TO
COMPLY WITH CERTAIN MINIMUM
SYSTEM CAPABILITIES THAT
RESULTED IN SERIOUS AND GRAVE
IRREGULARITIES IN THE
TRANSMISSION AND RECEIPT OF
ELECTION RETURNS AND, IF
WARRANTED, TO DISQUALIFY
SMARTMATIC FROM PARTICIPATING
IN THE BIDDING FOR THE 2025
AUTOMATED ELECTION SYSTEM,

E.M. No. 23-003

ELISEO MIJARES RIO, JR., AUGUSTO
CADELIÑA LAGMAN, FRANKLIN
FAYLOGA YSAAC, and LEONARDO
OLIVERA ODOÑO,

*Petitioners.*

x-------------------------------------------------x

## N O T I C E

1.   **ATTY. JOSE M. JOSE**
     *Counsel for the Petitioners*
     60 Rivera Street, Barangay Progreso
     San Juan City, Manila
     jmjose64@yahoo.com

2.   **ATTY. CHRISTIAN ROBERT S. LIM**
     **ATTY. MARIA DENISE CLAIRE C. MARCELO**
     *Counsels for the Respondent –* Smartmatic TIM Corporation
     Leynes Garcia Trillana Lim Lozada Golez Onrubia

     15th and 16th Floors, Petron Mega Plaza
     358 Sen. Gil Puyat Avenue
     1200 Makati City, Metro Manila
     lgton@lgtonlaw.com
     crlim@lgtonlaw.com
     ccmarcelo@lgton.com

Page 2 of 2

Notice of Resolution

In the Matter of the Petition to Review the Qualifications of Smartmatic Philippines, Inc. as a Prospective Bidder in view of its failure in the 2022 Elections to comply with certain minimum System Capabilities that resulted in serious and grave irregularities in the transmission and receipt of Election Returns and, if warranted, to disqualify Smartmatic from participating in the Bidding for the 2025 Automated Election System,

Eliseo Mijares Rio, Jr., Augusto Cadelina Lagman, Franklin Fayloga Ysaac, And Leonardo Olivera Odoño,

*Petitioners.*

E.M. Case No. 23-003

EN BANC

3. **ATTY. GEORGE S.D. AQUINO**
   **ATTY. LEO FREDERICK Z. CRUZ**
   **ATTY. MIGUEL RICO E. DE GUZMAN**
   **ATTT. GINO ISMAEL S. GERODIAS**
   **ATTY. GE-AN KATHLEENA SALUD**
   *Collaborating Counsels for the Respondent* - Smartmatic TIM Corp.
   Angara Abello Concepcion Regala & Cruz
   22nd Floor, ACCRALAW Tower
   2nd Avenue corner 30th Street, Cresent Park West
   Bonifacio Global City, 1635 Taguig City
   accra@accralaw.com gksalud@accralaw.com

4. **The LAW DEPARTMENT**
   This Commission
   law@comelec.gov.ph

5. **The EDUCATION & INFORMATION DEPARTMENT**
   This Commission
   eid@comelec.gov.ph

**GREETINGS:**

Attached is a copy of the **RESOLUTION** of the Commission **(EN BANC)** with **SEPARATE OPINION** of Commissioner Aimee P. Ferolino promulgated on _29_ November 2023 in the above-entitled case.

Given this _24th_ day of November 2023, City of Manila, Philippines.

FOR THE COMMISSION:

**ATTY. GENESIS M. GATDULA**
*Clerk of the Commission*



Republic of the Philippines
**COMMISSION ON ELECTIONS**
Manila

*EN BANC*

| | |
|---|---|
| IN THE MATTER OF THE PETITION TO REVIEW THE QUALIFICATIONS OF SMARTMATIC PHILIPPINES, INC. AS A PROSPECTIVE BIDDER IN VIEW OF ITS FAILURE IN THE 2022 ELECTIONS TO COMPLY WITH CERTAIN MINIMUM SYSTEM CAPABILITIES THAT RESULTED IN SERIOUS AND GRAVE IRREGULARITIES IN THE TRANSMISSION AND RECEIPT OF ELECTION RETURNS AND, IF WARRANTED, TO DISQUALIFY SMARTMATIC FROM PARTICIPATING IN THE BIDDING FOR THE 2025 AUTOMATED ELECTION SYSTEM, | **EM CASE NO. 23-003**  <br><br><br><br><br><br> Promulgated: <br> NOV 2 9 2023 |

ELISEO MIJARES RIO, JR., AUGUSTO CADELIÑA LAGMAN, FRANKLIN FAYLOGA YSAAC, AND

**LEONARDO          OLIVERA
ODOÑO**

*Petitioners*,

x------------------------------------------------x


# R E S O L U T I O N

Before the Commission (*En Banc*) is a *Petition to Review the Qualifications of Smartmatic Philippines Inc. as a Prospective Bidder in view of its Failure in the 2022 Elections to Comply with Certain Minimum System Capabilities that Resulted in Serious and Grave Irregularities in the Transmission and Receipt of Election Returns and, if Warranted, to Disqualify Smartmatic from Participating in the Bidding for the 2025 Automated Election System* ("*Petition*")[1] filed by **Eliseo Mijares Rio, Jr., Augusto Cadeliña Lagman, Franklin Fayloga Ysaac, and Leonardo Olivera Odoño** ("*Petitioners*").


## FACTS

On 15 June 2023, Petitioners filed the instant *Petition*, contending that they have identified serious irregularities in the automated election system employed by Respondent, Smartmatic Philippines Inc. ("Smartmatic") during the 09 May 2022 National and Local Elections. The alleged irregularities pertain to discrepancies between the transmission logs and reception logs of election returns (ER) from the precinct level to the Transparency Server.

The Petitioners are likewise alleging that during the period from 7:00 pm to at least 9:00 pm on 09 May 2022, the Transparency Server was reportedly receiving and tallying more votes than what the Voting Counting Machines (VCMs) were transmitting.

On 29 June 2023, the Petitioners submitted a *Supplemental Petition*[2] claiming that election results were transmitted from the VCMs to the Transparency Server using private Internet Protocol (IP) addresses instead

---

[1] *Records*, E.M No. 23-003.
[2] *Id.*

of public IP addresses, introducing another layer of concern regarding the electoral process.

The Petitioners argue that these unexplained discrepancies violate the legally mandated minimum system capabilities, thereby casting serious doubts on the integrity of the entire election process. If left unexplained, these issues are deemed sufficient to disqualify Smartmatic from participating in the procurement for the 2025 Automated Election System (AES).

As grounds to support their Petition for the disqualification of Smartmatic, the Petitioners invoked Paragraph 8.9 of Item 8, Appendix 32 of 2016 Updated 2016 Revised Implementing Rules and Regulations of Republic Act No. 9184 (2016 R-IRR) or the Guidelines on the Use of Framework Agreement by All Procuring Entities, which reads:

> "8.9 Notwithstanding the eligibility of a bidder, the BAC reserves the right to review the qualifications of the supplier or service provider. If there has been any change in the capability of the supplier or service provider to undertake its obligations under the framework agreement so that if it fails the eligibility criteria set thereon, the procuring entity shall consider the said supplier or service provider as ineligible and shall disqualify it from obtaining any award or contract."

Petitioners further invoked Section 6 of Republic Act No. 8436 as amended by Republic Act No. 9369, which states:

> SEC.6. Minimum System Capabilities. – The automated election system must at least have the following functional capabilities:
>
> a. Adequate security against unauthorized access;
> b. Accuracy in recording and reading of votes as well as in the tabulation, consolidation/canvassing, electronic transmission, and storage of results;
> c. Error recovery in case of non-catastrophic failure of device;
> d. System integrity which ensures physical stability and functioning of the vote recording and counting process;
> e. Provision for voter verified paper audit trail;
> f. System auditability which provides supporting documentation for verifying the correctness of reported election results;
> g. An election management system for preparing ballots and programs for use in the casting and counting of votes and to consolidate, report and display election result in the shortest time possible;
> h. Accessibility to illiterates and disable voters;
> i. Vote tabulating program for election, referendum or plebiscite;
> j. Accurate ballot counters;
> k. Data retention provision;

    *l.  Provide for the safekeeping, storing and archiving of physical or paper resource used in the election process;*

    *m.  Utilize or generate official ballots as herein defined;*

    *n.  Provide the voter a system of verification to find out whether or not the machine has registered his choice; and*

    *o.  Configure access control for sensitive system data and function.*

*In the procurement of this system, the Commission shall develop and adopt an evaluation system to ascertain that the above minimum system capabilities are met. This evaluation system shall be developed with the assistance of an advisory council. (Section 7, RA 9369 amending RA 8436).*

On 12 September 2023, the Petitioners submitted a *Second Supplemental Petition*[3] alleging that based on newly-discovered information, a Presidential candidate met with representatives of Smartmatic. Petitioners claim that this is a violation of Article 5.13 of the Contract with the Commission for the Procurement of Secure Electronic Transmission Services (SETS), which states:

*5.13. The PROVIDER, including but limited to its employees, representatives and agents shall not make any direct or indirect contact with any political party, candidate, partisan organization, or group at any given time with respect to the SETS project for the duration of this contract, except as provided by law to present technical demonstration or as may be authorized by the COMELEC.*

In support thereof, Petitioner submitted the Affidavit[4] of Atty. Glenn A. Chong who alleged that representatives of Respondent met with representatives of a presidential candidate in April 2022, in violation of the above contractual provision.

On 10 August 2023, the Commission (En Banc) issued an *Order*[5] directing the Law Department to review and submit a recommendation on the Petition and Supplemental Petition within ten (10) days from receipt.

The Law Department filed a *Motion for Extension of Time to Submit a Recommendation*, which the Commission (En Banc) in turn granted on 23 August 2023, giving the Law Department until 31 August 2023 to comply.

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

On 31 August 2023, the Law Department submitted its *Compliance*,[6] arguing that there is no legal basis to prohibit Smartmatic from participating in the Commission's Procurement Processes.

The Law Department argues that since Smartmatic was given its corresponding contracts through Public or Competitive Bidding and Repeat Order, none of the projects were subject of a Framework Agreement. As such, the Petitioner's invocation of Appendix 32 is misplaced.

The Law Department also notes that the right to review a bidder's qualifications stated in Section 23.6 of the 2016 R-IRR is similar to Item 8.9 of Appendix 32 cited by the Petitioners, which provides:

> 23.6 *Notwithstanding the eligibility of a bidder, the Procuring Entity concerned reserves the right to review the qualifications of the bidder at any stage of the procurement process if the Procuring Entity has reasonable grounds to believe that a misrepresentation has been made by the said bidder, or that there has been a change in the bidder's capability to undertake the project from the time it submitted its eligibility requirements. Should such review uncover any misrepresentation made in the eligibility requirements, statements or documents, or any changes in the situation of the bidder which will affect the capability of the bidder to undertake the project so that it fails the eligibility criteria, the Procuring Entity shall consider the said bidder as ineligible and shall disqualify it from obtaining an award or contract, in accordance with Rules XXI, XXII, and XXIII of this IRR.*

This right to review allows the Procuring Entity to reassess a bidder's qualifications at any stage of the procurement process if there is a belief of misrepresentation or a change in the bidder's capability. However, the right to review under Section 23.6 becomes operative when a particular project has already begun the procurement process, particularly when bidders have already submitted the required documents to prove eligibility.

The Law Department concluded that although the Terms of Reference for the 2025 National and Local Elections (NLE) Automation Project has been published, the procurement process has not started, making it premature to determine if the project will involve a Framework Agreement. Hence, there is simply no basis to review Smartmatic's or any other bidder's eligibility. Since the procurement process is yet to be commenced, there is no avenue to review the eligibility of Smartmatic either under Item 8.9 of Appendix 32 or Section 23.6 of the 2016 R-IRR.

---

[6] *Id.*

In addition, the prohibition to participate in the procurement process of a government which may be through suspension or blacklisting must be imposed in accordance with the Uniform Guidelines on Blacklisting integrated as Appendix 17 of the 2016 R-IRR as an administrative penalty for the following violations:

    *a) Submission of eligibility requirements containing false information or falsified documents.*

    *b) Submission of Bids that contain false information or falsified documents, or the concealment of such information in the Bids in order to influence the outcome of eligibility screening, or any other stage of the competitive bidding.*

    *c) Allowing the use of one's name, or using the name of another for purposes of competitive bidding.*

    *d) Withdrawal of a bid, or refusal to accept an award, or enter into contract with the Government without justifiable cause, after he had been adjudged as having submitted the Lowest Calculated Responsive Bid or Highest Rated Responsive Bid.*

    *e) Refusal or failure to post the required performance security within the prescribed time.*

    *f) Termination of the contract due to the default of the bidder.*

    *g) Refusal to clarify or validate in writing its bid during post-qualification within a period of seven (7) calendar days from receipt of the request for clarification.*

    *h) Any documented attempt by a bidder to unduly influence the outcome of the bidding in his favor.*

    *i) All other acts that tend to defeat the purpose of the competitive bidding, such as habitually withdrawing from bidding, submitting late Bids or patently, insufficient bid, for at least three (3) times within a year, except for valid reasons.*

For violations committed during the contract implementation stage, the penalty of blacklisting may be imposed only after the termination of the contract. Where termination of the contract is no longer possible, the procedure for blacklisting must be initiated within seven (7) days after the lapse of the project duration.

Upon inquiry to and as confirmed by the PMD, no suspension and blacklisting proceedings are pending or initiated against Smartmatic in relation to the projects it provided for the 2022 NLE. Therefore, there is no legal basis to prohibit Smartmatic from participating in the procurement process of the Commission.

With regard to other issues raised by the Petitioners, the Law Department contends that the Petitioners failed to substantiate the serious and material irregularities. Petitioners merely allege the existence of serious and material irregularities, and readily conclude that these violate the minimum system capabilities required under Section 6 of RA No. 8436, as amended by Republic Act No. 9369.

On 05 October 2023, the Commission (En Banc) issued an *Order*[7] setting the instant case for hearing on 17 October 2023. It also required Smartmatic to Comment on the Petition and two (2) Supplemental Petitions within five (5) days from receipt.

On 12 October 2023, Smartmatic filed its *Ex Abundanti Ad Cautelam Comment*.[8] Smartmatic stressed its consistent compliance with the Commission's guidelines since 2010, contributing to credible elections. Smartmatic asserts that the almost perfect match rate (99.84%) between physical and electronic Election Results in the 2022 Philippine NLE demonstrates the effectiveness of its system under the SETS Contract. Smartmatic also highlighted in its comment that the canvassing was unchallenged by major presidential candidates, Atty. Maria Leonor "Leni" Gerona Robredo and Francisco Moreno Domagoso.

Addressing the issue of early transmission of results, Smartmatic explains that the process for transmitting election results does not take as long as Petitioners claim. They elaborate that after the Electoral Boards close the election and complete necessary procedures, the VCMs can quickly print the first eight election results and transmit them. This process, contrary to the Petitioners' claims, need not take 19 minutes, debunking the improbability of transmitting twenty million votes within the first hour. Smartmatic further clarifies that each ER is only about five kilobytes (KB) of data, and the total data transmitted by approximately 39,000 VCMs is only around nineteen megabytes (MB), a volume easily manageable in modern data transmission standards.

Regarding the vote counting speed, Smartmatic refutes the notion of improbability in this aspect. They state that the 'Accumulated VCM Transmissions' and the 'Reception Logs' come from the same 'Transmission Router Logs', which accounts for all data transmission through their

---

[7] *Id.*
[8] *Id.*

infrastructure. They argue that if the graphs for both the 'Accumulated VCM Transmissions' were plotted accurately, there would be no discrepancy between the data received at the National Board of Canvassers and the Transparency Servers. They also point out that the Petitioners' graphs misrepresent the data, like showing accumulated transmissions for the first two hours compared to hourly data, which leads to skewed conclusions.

In addressing the allegation about the use of private IP addresses in the first *Supplemental Petition*, Smartmatic firmly refutes any suggestion of wrongdoing or fraud related to this matter. They stress that the use of private IP addresses does not translate to the utilization of any prohibited or unauthorized Local Area Network (LAN). Smartmatic clarifies that there is no evidence provided by the Petitioners, nor any laws stated, that would prohibit the use of private IP addresses for the transmission of ERs. They point out that there is no mandate under the Election Automation Law (RA No. 8436 as amended by RA No. 9369) requiring public IP addresses for the transmission of ERs.

Smartmatic further explains the technological context of their system's use of IP addresses. They note an upgrade in technology from 3G to 4G USB modems due to the discontinuation of 3G networks. This upgrade necessitated the use of both 3G and 4G modems in the 2022 NLE, with 4G modems undergoing rigorous review and certification. The use of 4G modems, unlike 3G modems, does not involve dialing to connect to a Service Provider Network. Instead, they function more like WIFI routers with a Wide Area Network (WAN) interface and a LAN interface, the latter being through a USB in this specific case.

The private IP addresses used were a result of the manufacturer's design, assigning all 4G USB modems a LAN IP Address of 192.168.0.1. When these modems are attached to a VCM, they assign the VCM a LAN IP address of 192.168.0.2, allowing the VCM and modem to communicate in a LAN environment. Additionally, the Subscriber Identity Module (SIM) card in the modem connects to the WAN of telecommunication companies, which then assigns a WAN IP Address for transmission in the Private Network created for election transmission purposes.

In their response to the allegations about an alleged improper meeting mentioned in the second *Supplemental Petition*, Smartmatic categorically

denies the claim. They describe this allegation as "completely false and untrue," emphasizing that it is based on an unverified and irresponsible statement by a person who is a stranger to the electoral process. Smartmatic contends that such an allegation is grounded in speculation rather than evidence, asserting that there was no illicit meeting that compromised the integrity of the election process.

They further elaborate that the petitions filed against them are improper, lacking legitimate issues worthy of consideration. Smartmatic argues that the Petitioners, through their filings, are attempting to resurrect disproven and moot issues.

On 13 October 2023, Petitioners filed their summary of exhibits.[9]

## ISSUE

The issue that must be resolved is whether or not the Commission as head of the Procuring Entity can review the qualifications of Smartmatic and potentially disqualify it from participating in the procurement process for the 2025 AES.

## RULING

At this stage of the procurement process for the 2025 AES, the Commission, as head of the procuring entity, cannot review the qualifications of Smartmatic. The procedural infirmity of the instant Petition must be pointed out.

The governing law on procurement-related subject matter is R.A. No. 9184 and its corresponding 2016 Revised Implementing Rules and Regulations (2016 R-IRR). On the issue of qualification of bidders, Section 23.6 of the 2016 R-IRR explicitly grants the relevant procuring entity the authority to assess the qualifications of a bidder at any juncture during the procurement process, provided there are reasonable grounds to suspect misrepresentation by the bidder or a change in the bidder's capacity to undertake the project since the submission of eligibility requirements.

---

[9] *Id.*

This provision underscores the Procuring Entity's right to examine a bidder's qualifications at any phase of the procurement process, irrespective of the bidder's initial eligibility. Notably, the right conferred by Section 23.6 becomes effective when a specific project has already initiated the procurement process, especially when bidders have already submitted the necessary documents to establish their eligibility.

Verily, at the time of filing or on 15 June 2023, neither the Commission nor the Special Bids and Awards Committee for 2025 AES (SBAC) for the 2025 AES possessed jurisdiction as the procurement process had not yet commenced.

However, on 13 November 2023, the SBAC conducted a pre-bid conference, marking the initial phase of the bidding process which gave SBAC the power to review the eligibility of all bidders. The pre-bid conference serves as the initial forum for discussions between the Procuring Entity's representatives and eligible bidders, covering various aspects of the ongoing procurement.[10]

Four (4) entities, including Smartmatic, manifested their interest to join the competitive bidding.

Since the holding of a pre-bid conference for the 2025 AES, the SBAC assumed jurisdiction over matters relative to the procurement of the 2025 AES, including those that pertained to the qualification of all prospective bidders. It must be noted, however, that the SBAC does not have the authority to readily decide on the qualification or disqualification of the prospective bidders pursuant to the procedure laid down in the 2016 R-IRR of R.A. No. 9184.

In NPM No. 104-2017,[11] the Government Procurement Policy Board (GPPB) clarified that a bidder may only be disqualified during Eligibility Screening, Bid Evaluation and Post Qualification. The relevant provisions

---

[10] Section 22, 2016 Revised Implementing Rules and Regulations of Republic Act No. 9184.
[11] 29 December 2017, accessible at https://www.gppb.gov.ph/wp-content/uploads/2023/06/NPM-No.-104-2017.pdf last accessed on 23 November 2023.

under the Revised IRR of the GPPB Rules are Sections 23,[12] 30,[13] 32[14] and 34,[15] respectively. Expounding the process of disqualification, the GPPB stated:

> "During Eligibility screening, we explained that the submission of the eligibility documents enumerated in Section 23.1 of the 2016 IRR is a mandatory requirement that must be complied with by the prospective bidders, such that failure to submit any of the documents or the submission of an otherwise incomplete or patently insufficient document, will disqualify the bidder based on the discretionary "pass/fail" criterion under Section 30.1 of the IRR.
>
> On the other hand, disqualification during the preliminary examination of bids provided under Section 30.1 of the 2016 IRR of RA 984 may lie when the BAC checks the submitted documents of each bidder against the checklist of required documents to ascertain if they are all present, using a non-discretionary "pass/fail" criterion.... Section 30.2 of the 2016 IRR, vests upon the authority to determine each bidder's compliance with the required documents for purposes of eligibility.
>
> Section 32.2.4 of the Revised IRR, likewise provides that the total bid prices as evaluated and corrected for computational error shall be ranked in ascending order, and those that exceeded the ABC shall be disqualified.
>
> Disqualification during the Post-Qualification stage is covered by Section 34 of RA 9184 and its 2016 IRR. The objective of the post-qualification is to determine whether the bidder complies with and is responsive to all the requirements and conditions specified in the bidding documents. During the post qualification, the BAC verifies, validates and ascertains all statements made and documents submitted by the bidder with the lowest calculated bid (LCB) or highest rated bid (HRB, as the case may be, using non-discretionary pass/fail criteria.
>
> These criteria shall consider the legal, technical, and financial requirement... Hence, the verification under the post-qualification stage is not limited to examination of documents submitted by the bidder, but also includes inspection of the subject equipment vis-á-vis the technical specifications specified in the bidding documents."

A careful review of these provisions will show that at this stage of the procurement process, the SBAC for AES 2025 is constrained to refrain from

---

[12] Section 23. Eligibility Requirements for the Procurement of Goods and Infrastructure Projects. Full provision is accessible at https://www.gppb.gov.ph/wp-content/uploads/2023/07/Updated-2016-Revised-IRR-of-RA-No.-9184-as-of-03-July-2023.pdf, last accessed on 23 November 2023.

[13] Section 30. Preliminary Examination of Bids. Full provision is accessible at https://www.gppb.gov.ph/wp-content/uploads/2023/07/Updated-2016-Revised-IRR-of-RA-No.-9184-as-of-03-July-2023.pdf, last accessed on 23 November 2023.

[14] Section 32. Bid Evaluation for the Procurement of Goods and Infrastructure Projects. Full provision is accessible at https://www.gppb.gov.ph/wp-content/uploads/2023/07/Updated-2016-Revised-IRR-of-RA-No.-9184-as-of-03-July-2023.pdf, last accessed on 23 November 2023.

passing upon the matter of qualifications of any potential bidder, including Smartmatic. According to the 2025 AES' timeline of procurement activities, the opening of bids is scheduled to be conducted on 12 December 2023.

Moreover, the blacklisting of Smartmatic cannot be insisted on regardless if the action is during the procurement stage or contract-implementation stage because of Petitioners' non-compliance with the procedural rules for blacklisting laid down under the 2016 R-IRR .

Under Section 5.0 of Appendix 17 of the Revised IRR, the procedure for blacklisting during the implementation stage is as follows:

> Any bidder/prospective bidder or duly authorized observer may initiate the blacklisting proceedings by filing a written complaint with the Bids and Awards Committee ("BAC"). The BAC may also motu proprio (by itself) commence the proceedings upon prima facie (self-sufficient) determination that the contractor as a bidder or prospective bidder has committed any of the grounds for blacklisting during the procurement stage.

> At the option of the procuring entities, a reasonable fee may be required for initiating the blacklisting proceedings.

On the other hand, under Section 6.2 of Appendix 17 of the Revised IRR, the procedure for blacklisting during the contract-implementation stage is commenced by a written notice of the Head of the Procuring Entity to the contractor, upon recommendation by the Implementing Unit.

Upon inquiry to and as confirmed by the PMD, no suspension and blacklisting proceedings are pending or initiated against Smartmatic in relation to the projects it provided for the 2022 NLE for purposes of pursuing the action during the contract-implementation stage, and for the bidding for the 2025 AES as regards the blacklisting of Smartmatic during the procurement process.

*The Commission, in the exercise of its plenary powers, may disqualify a potential bidder from participating in its procurement processes*

Separately, however, to the power granted to the Commission (EN Banc) as the Procuring Entity under relevant procurement laws, Sec. 2 (1) of Article IX of the 1987 Constitution grants upon the Commission the broad power to "enforce and administer all laws and regulations relative to the conduct of an election, plebiscite, initiative, referendum and recall."

In a plethora of cases,[16] the Supreme Court has repeatedly held that there can hardly be any doubt that the text and intent of this constitutional provision is to give the Commission all the necessary and incidental powers for it to achieve the holding of free, orderly, honest, peaceful and credible elections.

Verily, the Commission was deliberately constituted as a separate and independent body from other branches of government in order to ensure the integrity of our electoral processes. It occupies a distinct place in government as the constitutional body charged with the administration of our election laws. For this reason, the Constitution and our laws granted it powers and independence in the exercise of its powers and the discharge of its responsibilities.

The task of ensuring electoral integrity necessarily includes maintaining the public's confidence in the elections. To discharge this duty completely and effectively, the Commission should also assure the public that this obligation extends to its partners.

As early as October 2022, the Commission (En Banc), through the Department of Justice, received requests for official documents relative to an ongoing investigation from the United States government against former COMELEC Chairman Juan Andres D. Bautista (Bautista) and other individuals and entities for violation of U.S. criminal laws.

Pursuant to the treaty between the Government of the Philippines and the Government of the United States on Mutual Legal Assistance in Criminal Matters (PH-US MLAT), an investigation was conducted for the alleged violation of U.S. criminal laws, including the Foreign Corrupt Practices Act, conspiracy, wire fraud, and money laundering. The U.S. prosecutor sought

---

[16] *Bedol v Commission on Elections, G.R. No. 179830, 03 December 2009; citing Loong v Commission on Elections, G.R. No. 133676, 14 April 19909.*

assistance in obtaining official records from the Commission as part of the efforts to establish a case.

The evidence requested is deemed crucial for tracking the flow of suspected bribe payments and identifying other individuals involved in the alleged scheme. It is noteworthy that Bautista, who served as the Chairman of the Commission, was formally charged in September 2023, in connection with allegations of receiving bribes in exchange for awarding a contract for election machines to Smartmatic Corp. Bautista and others are alleged to have laundered the bribe money through multiple entities. It was revealed that Bautista established a foreign shell company, which was used to receive bribe payments from Smartmatic. The charges against Smartmatic and former Chairman Bautista are of public knowledge and tend to cause speculation and distrust in integrity of the electoral process.

Given the gravity of allegations related to bribery and compromised procurement processes, as independently determined by foreign bodies, the Commission recognizes the imminent threat to the strength and integrity of our democratic processes. In light of these findings, the Commission acknowledges the imminent peril to the integrity and robustness of our democratic institutions. These allegations, not only undermine and cast a shadow over the procurement protocols but also threaten to erode the public's confidence in the electoral system. Consequently, pursuant to administrative powers which cover all aspects of election, the Commission is compelled to take decisive action to disallow Smartmatic from participating in the procurement process forthwith.

Moreover, the Commission finds it imperative to refer the matter to the SBAC for possible permanent disqualification and blacklisting of Smartmatic from all government procureemnt proceedings, not just in relation to elections. This critical step reflects the Commission's unwavering dedication to maintaining the sanctity of our elections and ensuring that each component of the electoral process, especially its partnerships, upholds the highest standards of transparency and integrity.

The Commission (En Banc), in pursuing the instant course of action, recognizes its duty to uphold the integrity of elections. It cannot overlook the serious, unresolved allegations against Smartmatic related to previous elections. Although these allegations, stemming from incidents potentially

spanning at least three election cycles, have not been conclusively proven, their gravity and potential to damage public trust warrant the Commission (En Banc's) proactive measures to safeguard the integrity of elections and democratic institutions.

To be clear, the Commission (En Banc) categorically states that no irregularities attended the conduct of the 2022 NLE. The allegations of Petitioners pertaining to the alleged consistency in the ratio of transmitted results, the use of single IP address, and alleged discrepancies in the transmission and election returns have been sufficiently addressed by the Commission at length.

In fact, apart from the successful conduct of the Random Manual Audit attended by independent observers and accredited political parties showing the consistency in the results, and the observations by accredited citizens' arms.[17] Petitioners themselves admitted that the parallel count conducted by the Parish Pastoral Council for Responsible Voting (PPCRV) matched the transmitted results. Nevertheless, the Commission is cognizant that issues casting doubt on the veracity of the 2022 NLE results undermine our democracy by eroding public trust and confidence in our electoral processes. The Commission will do everything necessary and within its power to demonstrate its commitment to electoral integrity and full transparency.

Regarding the prayer of Petitioners for the Commission to post in its official website the List of Vote Counting Machines (VCM) Transmission for the 2022 NLE corroborated by the telecommunication companies' Call Detail Record (telco's CDR), it bears noting that the request has been mooted as the Commission has already uploaded the telecommunication provider logs in its official website as of 6 September 2023. Therefore, the same has been made available to Petitioners and the public.

Still pursuant to its constitutional mandate to decide all matters affecting elections, and in line with its commitment to transparency, the Commission (En Banc) during the 17 October 2023 hearing[18] stated that it

---

[17] *See* "NAMFREL Final Report, 2022 National and Local Elections," published by the National Citizens Movement for Free Elections (NAMFREL), published on 19 August 2022, last accessed at https://namfrel.org.ph/2022/files/NAMFREL%202022%20NLE%20REPORT%20(FINAL,%20DIGITAL).pdf on 23 November 2023 and *Letter Addressed to Coordinator and Volunteers* of the Parish Pastoral Council for Responsible Voting, dated 29 August 2023, last accessed at https://www.scribd.com/document/668618029/A-year-after-polls-PPCRV-reiterates-rigging-claims-unsubstantiated#download&from_embed on 23 November 2023;

[18] *Transcript of Stenographic Notes,* En Banc Hearing, 17 October 2023.

may authorize a recount by opening the ballot boxes of every region in the country upon Petitioners' instance, considering that the most reliable evidence in an election is typically the ballots themselves. This process, incidental to the Commission's mission, aligns with the public interest and the right to information in all matters relating to the election. In the landmark case of *Chavez vs. Gonzales,*[19] the Supreme Court underscored the overwhelming right and need of the public to be informed of matters concerning elections, by stating:

> The right of the people to know matters pertaining to the integrity of the election process is of paramount importance. It cannot be sideswiped by the mere speculation that a public disturbance will ensue. Election is a sacred instrument of democracy. Through it, we choose the people who will govern us. We entrust to them our businesses, our welfare, our children, our lives. Certainly, each one of us is entitled to know how it was conducted. What could be more disheartening than to learn that there exists a tape containing conversations that compromised the integrity of the election process. The doubt will forever hang over our heads, doubting whether those who sit in government are legitimate officials. In matters such as these, leaving the people in darkness is not an alternative course. (Citations omitted)

The Commission (En Banc) shall, upon motion, authorized a recount, utilizing for the said purpose either the physical ballots or the ballot images which are the functional equivalent of the physical ballot, at no cost to Petitioner. This is consistent with the Commission (En Banc)'s commitment to uphold fair, orderly, and honest elections and to pursue all avenues to strengthen transparency in the conduct of elections.

**WHEREFORE,** premises considered, the Commission *(En Banc)* hereby **RESOLVED** to **GRANT** the Petition. **SMARTMATIC PHILIPPINES, INC.** is **DISQUALIFIED AND DISALLOWED** from participating in any public bidding process for elections, in the exercise of its administrative power to decide all matters affecting election and in pursuit of its constitutional mandate.

**FURTHER,** the Commission *(En Banc)* hereby **RESOLVES** that in the exercise of its administrative power, it may, upon Petitioner's instance, order the conduct of the recount of ballots in areas in every region in the country, the procedure and extent of which to be determined, and at no cost to Petitioner.

---

[19] G.R. No. 168338, 15 February 2008.

E.M. No. 23-003
*En Banc Resolution*

Page 17 of 17

**SO ORDERED.**

GEORGE ERWIN M. GARCIA
*Chairman*

SOCORRO B. INTING
*Commissioner*

MARLON S. CASQUEJO
*Commissioner*

with seperate opinion

AIMEE P. FEROLINO
*Commissioner*

REY E. BULAY
*Commissioner*

ERNESTO FERDINAND P. MACEDA, JR.
*Commissioner*

NELSON J. CELIS
*Commissioner*

## CERTIFICATION

I hereby certify that the conclusions in the above resolution were reached in consultation among the members of the Commission (En Banc) before the case was assigned to the writer of the opinion of the Commission.

GEORGE ERWIN M. GARCIA
*Chairman*



**Republic of the Philippines**
**COMMISSION ON ELECTIONS**
*Intramuros*, Manila

*EN BANC*

IN THE MATTER OF THE PETITION
TO REVIEW THE QUALIFICATIONS
OF SMARTMATIC PHILIPPINES,
INC.[1] AS A PROSPECTIVE BIDDER
IN VIEW OF ITS FAILURE IN THE
2022 ELECTIONS TO COMPLY WITH
CERTAIN   MINIMUM   SYSTEM
CAPABILITIES THAT RESULTED IN
SERIOUS    AND    GRAVE
IRREGULARITIES    IN    THE
TRANSMISSION AND RECEIPT OF
ELECTION   RETURNS   AND,   IF
WARRANTED,   TO   DISQUALIFY
SMARTMATIC   FROM
PARTICIPATING IN THE BIDDING
FOR   THE   2025   AUTOMATED
ELECTION SYSTEM,

**EM Case No. 23-003**

ELISEO   MIJARES   RIO,   JR.,
AUGUSTO   CADELIÑA   LAGMAN,
FRANKLIN FAYLOGA YSAAC, AND
LEONARDO OLIVERA ODOÑO,
                              *Petitioners.*
x‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑‑x

NOV 2 9 2023



## SEPARATE OPINION

The strength and stability of our democracy depend to a large extent on the faith and confidence of our people in the integrity of the electoral process where they participate as a particle of democracy. This jurisprudential polestar, as enunciated by Justice Del Castillo in *Doromal vs COMELEC*[2], is an immutable principle that we ought to uphold in order to arrive at a just resolution of the instant controversy.

---

[1] In the Petition, may also be doing business under Smartmatic Corporation, Smartmatic International, and Smartmatic SGO Group.

[2] Doromal vs Biron and Commission on Elections, G.R. No. 181809, 17 February 2010.

This Petition is hinged on the alleged serious irregularities employed by Respondent Smartmatic Philippines, Inc.[3] on the Automated Election System during the 09 May 2022 National and Local Elections (NLE).

Backed by the result of the Random Manual Audit as well as the declaration by the accredited citizens' arms, we are unanimous in affirming the credibility of the concluded 2022 NLE. On the issues raised in the Petition, I agree with the Law Department that Petitioners failed to substantiate the alleged irregularities. As regards procedural rules, I concur that the Commission lacks jurisdiction to disqualify Smartmatic Philippines, Inc., or any prospective bidder, before the submission of the eligibility documents pursuant to the 2016 Revised Implementing Rules and Regulations of Republic Act No. 9184[4] (IRR).

In accordance with the Uniform Guidelines on Blacklisting under the 2016 R-IRR,[5] a bidder may be prohibited from participating in the procurement process for a given period through blacklisting. This process may be initiated motu proprio by the Bids and Awards Committee during Competitive Bidding Stage upon prima facie (self-sufficient) determination that the contractor as a bidder or prospective bidder has committed any of the grounds for blacklisting. During the contract implementation, the Head of the Procuring Entity shall immediately issue a Blacklisting Order upon termination of the contract due to default of the contractor, disqualifying the erring contractor from participating in the bidding.

I concur with the Majority that the blacklisting of Smartmatic cannot be insisted on whether the action is during the procurement or contract implementation stage due to Petitioners' non-observance of the aforementioned Guidelines. Surely, the procedures provided under R.A. No. 9184 and its IRR are mandatory and cannot be simply brushed aside by the Commission.

It strikes me that a distant matter has been interjected into this case. In disqualifying Smartmatic, the majority invokes an authority outside of R.A. No. 9184 and its IRR, and based their ruling solely on the allegations and issues involving former COMELEC Chairman Juan Andres D. Bautista (Chairman Bautista). ₦

---

[3] See Note 1.
The contracts (1) Vote Counting Machines Refurbishment with Consumables (SBAC Reference No. 01-2020 VCMRC) and (2) Lease of OMR/OPSCAN Precinct Counter with SD Cards for Use in the 2022 NLE (SBAC Reference No. 15-2021OMR) were awarded to SMMT-TIM 2016, Inc.
[4] An Act Providing for the Modernization, Standardization and Regulation of the Procurement Activities of the Government and for Other Purposes.
[5] Uniform Guidelines for Blacklisting of Manufacturers, Suppliers, Distributors, Contractors and Consultants.

It may be proper to take into consideration the criminal case filed in the United States against Chairman Bautista on the alleged bribery relating to the contract with Smartmatic for the election machines. This circumstance alone, however, does not warrant an outright condemnation of persons or entities involved in the said foreign criminal case. This case is still pending investigation, and there is no supporting evidence on record. Indeed, the Commission may take judicial notice of matters of public knowledge, but we must first "allow the parties to be heard thereon.[6]"

In administrative proceedings, such as this, due process demands that the adjudicating body properly informs a party of the charges against them and afford them the opportunity to present their defenses and supporting evidence, which it must consider in making its decision.

To note, the Petitions dated 15 June 2023, Supplemental Petition dated 29 June 2023, and Second Supplemental Petition dated 11 September 2023 did not contain the allegations of bribery against Smartmatic. No evidence in relation thereto was pre-marked, more so presented or discussed during the 17 October 2023 hearing. The only mention of this issue was found for the very first time in the Motion for Early Resolution dated 03 October 2023 of Petitioners and the single paragraph in the prefatory statement in Petitioner's Memorandum. It was however neither cited as an argument in the Memorandum nor any document in support of the existence and veracity thereof offered in Petitioner's Formal Offer of Evidence with Manifestation and Motion dated 23 October 2023.

In ruling against Smartmatic based on an issue never properly raised, Respondent Smartmatic was deprived of its right to be properly notified of the allegations against it and was not given an opportunity to defend itself against those allegations.

The disqualification of Smartmatic was anchored upon the Commission's broad power to "enforce and administer all laws and regulations relative to the conduct of an election, plebiscite, initiative, referendum and recall" under Section 2(1) of Article IX-C of the 1987 Constitution. It is important to note that under Section 2, Article IX-C of the 1987 Constitution, the COMELEC exercises both administrative and quasi-judicial powers.

In *Baytan v. COMELEC*[7], the Supreme Court differentiated between these two functions, explicitly stating that under Section 2 of Article IX-C of the Constitution, subsections 2(1), and (3) to (9) are exercised under the

---

[6] Herrera vs Bollos, G.R. No. 138258, 18 January 2002.

[7] G.R. No. 153945, 4 February 2003.

administrative functions of the COMELEC, while it exercises quasi-judicial functions in relation to those cases enumerated under Section 2(2).

It should be emphasized that the Commission's administrative power under Section 2(1), Article IX-C of the 1987 Constitution, as stated therein, refers only to the enforcement and administration of election laws. For this constitutional provision to be validly invoked, there must be an election law to "enforce" or "administer." Hence, the Commission, in the exercise of such power, cannot whimsically rule on any and all election matters without any basis in law or its own prescribed rules. This is consistent with the definition of its administrative adjudication, which is the power to hear and determine questions of fact to which the legislative policy is to apply and to decide under the standards laid down by the law itself in enforcing and administering the same.

Case law further provides that a constitutional provision is not self-executing where it merely announces a policy and its language prescribes another means by which the policy shall be carried into effect. In the case of *Ang Bagong Bayani-OFW Labor Party v. COMELEC*[6], it was held that where the law is "interspersed with phrases like 'in accordance with law' or 'as may be provided by law', then it is up to Congress to sculpt in granite the lofty objective of the Constitution."

We value greatly the faith and confidence of the people in the integrity of the electoral process; thus, we must afford them with the utmost degree of prudence in all our actions. It is my submission that integrity is adherence to principles while being steadfast in the observance of the laws and rules.

With due deference to the majority opinion, my vote is for the dismissal of the instant Petition.


**AIMEE P. FEROLINO**
Commissioner


---

[6] G.R. No. 147589, 25 June 2003.

# EXHIBIT C



**Andy Bautista**
@ChairAndyBau

···

I am surprised to learn about a complaint filed against me. I have never been contacted by the U.S. Department of Homeland Security about it for comment.

But let me be very clear. I did not ask for nor receive any bribe money from Smartmatic or any other entity. (1/3)

7:20 PM · Sep 21, 2023 · **193.7K** Views

○ 275          ⇄ 185          ♡ 963          🔖 33          ⬆

Post your reply                                    ( Reply )

**Andy Bautista** @ChairAndyBau · Sep 21          ···
Be that as it may, I am ready to respond to the alleged charges at the proper forum and time.

The 2016 Philippine National Elections were hailed by various independent national and local election stakeholders as the best managed in our electoral history. (2/3)

○ 30          ⇄ 23          ♡ 251          �ⅰⅰⅰ 21K          🔖 ⬆

**Andy Bautista** @ChairAndyBau · Sep 21          ···
Moreover, the Philippine Supreme Court voted unanimously (15–0) to dismiss an electoral protest that was filed in connection with the 2016 Vice Presidential contest.

"Every storm runs out of rain."
-Maya Angelou (3/3)

○ 45          ⇄ 28          ♡ 343          ⅰⅰⅰ 28K          🔖 ⬆

# EXHIBIT D

 SMARTMATIC

**Statement Smartmatic**
**November 29, 2023**

Smartmatic has not been notified of the decision and has yet to receive the official copy.

However, Smartmatic expresses profound disappointment in the decision made by the Commission on Elections (Comelec) to disqualify Smartmatic from bidding on the 2025 contract for election technology.

In its 23-year history, no Smartmatic company has ever been indicted in the United States or any other country in connection with any election or election-related contract. This information is easily verifiable on the US Department of Justice website by searching 'Smartmatic.'

We urge Comelec officials to conduct this search independently, and to show to the public any indictment against Smartmatic. We are confident there is no such indictment in the United States.

Over the course of these 15 years, as we contributed technology and services to Comelec, we have consistently adhered to all their procurement processes during biddings and contract execution. Our significant role has played a key part in establishing the Philippines as a global model for election integrity.